[Crim. No. 21528. Second Dist., Div. Five. Mar. 26, 1973.]

THE PEOPLE, Plaintiff and Respondent, v.
ARTHUR THOMAS CONRAD, JR., Defendant and Appellant.

## COUNSEL

Richard H. Levin, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Edward A. Hinz, Jr., Chief Assistant Attorney General, William E. James, Assistant Attorney General, Norman H. Sokolow and Bradley A. Stoutt, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**COLE, J.** *—Defendant Arthur Thomas Conrad, Jr., was found guilty by a jury of one count of murder, six counts of robbery in the first degree and two counts of oral copulation. As to each of the six robbery counts he was found to have been armed at the time of the commission of the offenses. It was also found as to two of the robbery counts that defendant intended to and did inflict great bodily harm on the victim. As to the oral copulation counts it was charged and found that those offenses were accomplished by means of force, violence, duress, menace, and threats of great bodily injury. The jury found two prior convictions charged against defendant to be not true. A penalty trial was held as to the murder count and the jury returned a verdict of life imprisonment.

Defendant does not attack the sufficiency of the evidence to support any of the convictions but raises some 17 contentions as to various errors which are alleged to have occurred. Only so much of the facts as is necessary to illustrate the various contentions will be set forth. It is also necessary to discuss the procedural history of the case.

The murder and robbery involved in the first two counts occurred on February 22, 1971. The other robberies and the sexual offenses (perpetrated upon two of the robbery victims) occurred in a period commencing December 15, 1970 and ending February 24, 1971.

At approximately 2:30 in the morning on February 27, 1971, defendant entered a Long Beach police station and indicated to Officer Frost, who was on duty, that he wanted to turn himself in. When asked why, he said that it was for murder. When asked when the murder happened, defendant said that it was one week previously in Bellflower. Frost promptly turned defendant over to another Long Beach officer, Detective Bell, who took defendant to his office and had a conversation in which defendant admitted the murder. At approximately 4:30 a.m. on February 27 and while still in Detective Bell's office, defendant made another statement to sheriff's officers in which he described the murder. He stated that the victim was stabbed to death when she resisted his robbery of her store.

---

*Assigned by the Chairman of the Judicial Council.

At approximately 11 a.m. on the morning of February 27 at the Los Angeles County jail, defendant made a further statement to Sheriff's Officers O'Farrell and Ellender in which he again admitted the murder and robbery. At the end of that statement defendant said that he had something serious to talk about to the officers and that he would like to talk to them again at a later time. On the next evening, February 28, at approximately 8 p.m. defendant made yet another statement to the officers at the jail admitting certain robberies and the two sexual offenses (with all of which he was ultimately charged) and further describing the murder.

A one count information charging defendant with murder was filed on April 8, 1971 (action No. A-422129). That information was amended on September 16, 1971 to add as count II thereof the robbery out of which the murder arose. The relevant allegations of count II accuse defendant of the robbery of Ruby Mae Cates, alleging simply that it was "with intent to and did inflict great bodily injury upon the victim . . ."

The previous day, September 15, 1971, information No. A-425329 had been filed. That information contained five counts of robbery and two charging violations of Penal Code section 288a. Each of the robbery charges in this information alleged that defendant was armed with a deadly weapon, a knife, at the time of the commission of the offenses and referred to offenses discussed with the officers the preceding February.

### Consolidation of the Two Informations

On the People's motion and over objection by defendant the second information was consolidated with the earlier one charging murder.

This brings us to the first contention raised by defendant on this appeal —that consolidation was improper. In support of this argument, defendant first urges that the offenses involved are not within the same class within the meaning of Penal Code section 954.[1]

---

[1]Penal Code section 954: "An accusatory pleading may charge two or more different offenses connected together in their commission, or different statements of the same offense or two or more different offenses of the same class of crimes or offenses, under separate counts, and if two or more accusatory pleadings are filed in such cases in the same court, the court may order them to be consolidated. The prosecution is not required to elect between the different offenses or counts set forth in the accusatory pleading, but the defendant may be convicted of any number of the offenses charged, and each offense of which the defendant is convicted must be stated in the verdict or the finding of the court; provided, that the court in which a case is triable, in the interests of justice and for good cause shown, may in its

The argument is misplaced. In supporting his motion the district attorney pointed out that in order to prove the modus operandi under which the defendant committed the murder, evidence of a similar modus operandi in connection with each of the five additional robberies would be introduced. In addition it would be necessary to try the counts set out in the second information separately if there was no consolidation.

■ The offenses were properly consolidated. The robbery offenses set forth in the second information are obviously of the same class as the robbery charged in the first information. The sexual offenses involved in the second information were connected together in their commission with two of the robberies charged. "[T]he situation here comes within the holdings of cases which permit joinder of offenses, even though they do not relate to the same transaction and were committed at different times and places and against different victims, where there is a common element of substantial importance in their commission. [Citations omitted.] Here the element of intent to feloniously obtain property runs like a single thread through the various offenses, . . ." (*People* v. *Chessman,* 52 Cal.2d 467, 492 [341 P.2d 679].) "[A] joinder of distinct offenses is permissible if there is a common element of importance in their commission." (*People* v. *Kemp,* 55 Cal.2d 458, 475 [11 Cal.Rptr. 361, 359 P.2d 913].)

In the case at bench the defendant robbed a series of female storekeepers at knife point to obtain money. Clearly there was "a single thread" and "a common element of importance" in the commission of the offenses charged. (See *People* v. *Shells,* 4 Cal.3d 626, 631 [94 Cal.Rptr. 275, 483 P.2d 1227].)[2]

Defendant urges that he was prejudiced by the consolidation. His argument is that counsel was placed in a position where he could not adequately defend the robbery and oral copulation charges because if he waged a vigorous defense he ran the risk of irritating or otherwise disenchanting the jury. He also argues that he had to do everything within his power "to maintain his ethos and esteem in the eyes of the jury" in view of the

discretion order that the different offenses or counts set forth in the accusatory pleading be tried separately or divided into two or more groups and each of said groups tried separately. An acquittal of one or more counts shall not be deemed an acquittal of any other count."

[2]Defendant refers us to *Derryberry* v. *Superior Court* (Cal.App. Oct. 10, 1972) in which a consolidation order was held to be erroneous. While the Supreme Court denied a hearing in that case it was ordered that the *Derryberry* opinion not be published in the permanent volumes. Such an order has been held to destroy the precedential value of an opinion. (*People* v. *Gomez,* 26 Cal.App.3d 928, 930-931 [103 Cal.Rptr. 453].)

fact that the same jury would be sitting at the murder penalty trial. His startling conclusion is that counsel was compelled to permit the jury to convict defendant of the charges in the second information. He does not suggest what evidence or defense could have been put on. Further, he urges that the presence of those charges hampered efforts to defend the murder case. Again defendant does not suggest what defense might have been presented.

"It is also the law that one asserting prejudice because of a joint trial assumes the burden of proving it. A bald assertion of prejudice is not enough. (*People* v. *Duane, supra,* 21 Cal.2d 71, 78; *People* v. *Northcott,* 209 Cal. 639, 648 [289 P. 634, 70 A.L.R. 806].) While appellant asserts that the jury must have been influenced by the evidence on the rape charges in considering the murder charge, the mere assertion of that fact does not prove it." (*People* v. *Kemp, supra,* 55 Cal.2d 458, 477.) Section 954 expressly provides that the choice of consolidation, *vel non,* is within the discretion of the court. (*People* v. *Duane,* 21 Cal.2d 71, 78 [130 P.2d 123].) No abuse has been shown.

### Speedy Trial

Defendant's next argument relates to the delay in filing the second information which was subsequently consolidated with the original murder charge. He points out that by February 27, 1971, he had been connected with the various offenses later charged in the second information and that by February 28, 1971, he had admitted participation in those robberies. Nevertheless the information was not filed for six and one-half months. He charges that he was denied his right to a speedy trial.

The law governing delays in bringing charges against one who subsequently becomes a defendant is set out in *People* v. *Archerd,* 3 Cal.3d 615, 639-640 [91 Cal.Rptr. 397, 477 P.2d 421]. Paraphrasing that decision, pre-indictment delay requires a defendant to first show prejudice or improper motive by the prosecution in delaying an indictment. It is the defendant's burden to show that there was no legitimate reason for the delay and that he was prejudiced by it. If he carries that burden, the People must then show that the delay was the result of a valid police purpose. Prejudice may be shown by the loss of a material witness or other missing evidence or by fading memory caused by the passage of time. The government may not deliberately use delay to weaken the defense "The delay must be purposeful, oppressive, and even 'smack of deliberate obstruction on the part of the government,' before relief will be granted." The facts and circumstances must be viewed in light of five

factors; the time involved; who caused the delay; the purposeful aspect of the delay; prejudice to the defendant; and waiver by the defendant. (*Archerd* at p. 640.) (See also *Jones* v. *Superior Court,* 3 Cal.3d 734, 740 [91 Cal.Rptr. 578, 478 P.2d 10]: "The prejudicial effect of the delay on petitioner must be weighed against any justification for the delay.")

The United States Supreme Court has recently spoken on the subject of speedy trial in *Barker* v. *Wingo,* 407 U.S. 514 [33 L.Ed.2d 101, 92 S.Ct. 2182]. There the court unanimously held that in evaluating whether or not a defendant has been deprived of his constitutional right to a speedy trial a balancing test must be employed. The factors to be employed, said the Supreme Court, are length of the delay, whether and how the defendant asserts his rights, the government's reasons for the delay, and prejudice to the defendants. (P. 530 [33 L.Ed.2d at p. 117].) The Supreme Court stated that none of these four factors is "either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial. Rather, they are related factors and must be considered together with such other circumstances as may be relevant."

■ Here the defendant's claim that he was prejudiced is stated to consist of his inability to conduct a timely cross-examination of prosecution witnesses. He points out that at the preliminary hearing held in September the magistrate prevented witnesses, who had been shown photographs from which they identified defendant in February, from testifying as to those identifications. The magistrate stated that it was almost impossible to ask a witness to remember what had occurred. Defendant might have a point if the facts of his case were somewhat different.[3]

Under the facts of this case, however, defendant was deprived of no meaningful rights. He had already confessed to the crimes charged in the information. His identity was not at all a real issue in the case. There simply is no prejudice involved. The lack of prejudice is not only a factual one but a legal one. *Barker* v. *Wingo, supra,* 407 U.S. 514, 532 [33 L.Ed.2d 101, 118], stated in connection with the factor of prejudice that it, ". . . should be assessed in the light of the interests of defendants which the speedy trial right was designed to protect. This Court has identified three such interests: (i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired. Of these, the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." Here defendant was

---

[3]We in no way intimate that the magistrate's ruling was correct.

already incarcerated on account of the murder charge. Therefore there was no oppressive pretrial incarceration and no significant anxiety and concern which he might have suffered. Since identification is not a real issue, no impairment of his defense appears. The trial court held that the defendant had not suffered any prejudice on account of the delay[4] and we agree.

### Right to Plead Guilty

Defendant next asserts that prior to his trial he moved to enter a plea of guilty to first degree murder on the condition that the court would impose life imprisonment. The offer to plead was opposed by the People who argued that the jury should be the entity to determine the penalty. The court refused to accept the plea stating that Penal Code section 1192.3 provided that in order for a plea specifying punishment to be made it is necessary that the plea be accepted by the prosecutor and that the prosecutor here refused.[5]

The argument made on this appeal is that the sentencing power is a judicial one and that under reasoning akin to that of *People* v. *Tenorio*, 3 Cal.3d 89 [89 Cal.Rptr. 249, 473 P.2d 993], it is a violation of the separation of powers concept for the prosecutor to have a say in the sentencing process. The People reply that in potential death penalty cases the fact trier had long been given the decision of life or death and that in this context, like a plea bargaining situation, the prosecutor should have the opportunity to say whether the defendant's offer was in the interests of justice in a particular case. We need not resolve this argument because clearly no prejudice accrued to defendant.[6]

### Contentions re Statements to Officers

The defendant makes a series of arguments that his statements to

---

[4]It may be noted that the declaration of counsel presented to the trial court in support of his motion to dismiss for lack of a speedy trial confirms the lack of prejudice. Rather than discussing the inability of counsel to cross-examine witnesses with fading memories, it merely recited the chronological facts of the case including the fact that the murder trial was put off until the prosecution decided whether to seek the death penalty. That decision was made on July 27, 1971, and on that same date trial was continued to October 12 with the second information being filed in the interim.

[5]At the time of the offer to plead section 1192.3 had, in actuality, been repealed and had been replaced by a similar provision which appeared, and still appears, in section 1192.5.

[6]Defendant's request is that the judgment as to all of the counts should be reversed, that the trial court should be directed to permit him to plead guilty to first degree murder and that he should receive a new trial as to the other counts.

various police and sheriff's officers admitting the offenses charged should be suppressed.

■ First, we reject out of hand his claims concerning Officer Frost. Defendant concedes that his statement that he wanted to turn himself in was admissible but says that Officer Frost should not have asked him why he wanted to do so and should not have inquired where the murder occurred. *Miranda* v. *Arizona,* 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974], argued in this connection by defendant is an inapt citation. As Officer Frost himself testified, at that point defendant clearly was not in custody. He was free to leave. *Miranda* itself indicates that its requirements are not applicable to a person who walks into a police station to confess his crime. (*Miranda* v. *Arizona, supra,* 384 U.S. at p. 478 [16 L.Ed.2d at p. 726]; *People* v. *Powell,* 67 Cal.2d 32, 51 [59 Cal.Rptr. 817, 429 P.2d 137].)

It will be remembered that after defendant's brief talk with Officer Frost, Detective Bell then took defendant to his office. There Bell administered *Miranda* warnings and secured a waiver and heard out defendant's confession, the time being approximately 2:30 a.m. Less than two hours later Sheriff's Officers Deiro, Dorris and Grimm had a similar conversation with defendant, and again defendant waived his rights. Defendant's argument is based on a claimed lack of a knowing and intelligent waiver of those rights. Defendant testified that he had been drinking during the day and evening preceding his confession. Before taking him to the county jail the sheriff's officers stopped by a hospital and had a blood sample taken. This produced a reading of .10 percent. This sample was taken at 6:28 a.m.

Defendant's claim that this much alcohol in his blood at 6:28 a.m. made him incapable of knowingly and voluntarily waiving his rights at 2:30 and 4:30 a.m. is based on the testimony of an expert witness produced by him. The witness, a former criminalist for the sheriff's department, testified in effect that at the time of the earlier statement defendant's blood alcohol content would have been between .14 percent and .22 percent with the average person's blood alcohol level at that time being .18 percent. At the time of the 4:30 statement defendant's blood alcohol level, according to the expert, would have been between .12 percent and .16 percent with the average person's level at .13 percent. The expert also testified that a person's judgment and reasoning are definitely impaired with an .18 percent blood alcohol level while there is a loss of critical judgment at .19 percent. The expert was subjected to long and lengthy examination and cross-examination. He also testified that the percentages given by him

were average figures, that he could not say what defendant's reading was at a given time, that individuals had different tolerances, that persons with a reading between .14 percent and .22 percent would have an impaired ability to understand the nature and consequence of their actions but that not every decision they made would be wrong. The trial court heard a recording of a portion of the statement made by defendant to the sheriff's officers at approximately 4:30 a.m. The recording was listened to not for its content, but rather so that the court could get the tone of defendant's responses.

At the conclusion of the lengthy hearing, the trial court ruled as stated in the margin.[7] Defendant also made a statement at 11 a.m. to sheriff's officers at the jail and a second statement at 8 p.m. on February 28. These statements are challenged on two additional grounds—as to each of them it is argued that defendant was under the influence of medication given at the jail, and as to the second statement it is further claimed that he had indicated a desire not to be questioned before the second statement commenced. The basis for the first claim is that jail hospital records introduced into evidence indicated that on February 27 and February 28 defendant was given various types of medication including tranquilizers.[8] Defendant goes on to argue that because of "the deliberate manner" in which he was given drugs there is a strong inference that the police were trying to "drug" him so that he could talk more freely. If that

[7]"The prosecution witnesses uniformly testified that in none of the interviews were they able to find any indication of the defendant being objectively under the influence of either drugs or alcohol, although on occasion, the witnesses did smell alcohol and observed a slight aspect of bloodshot eyes. On the other hand, the defendant indicates that on various occasions, he was drunk on alcohol and so under the influence of drugs that he was groggy, run down, and that his thoughts and eyes were blurred.

"The Court has weighed the conflicting evidence, including what the Court considers to be a very impartial piece of testimony, and that is the listening to of the tape recording. That tape recording, of course, is not indicative as to the defendant's condition at each and every interview, but at the interview of which it was taken, the Court was impressed by the defendant's acuity, his alertness, the form and content of his responses, and the lack of slurring of words, misunderstanding of questions, long pauses. In fact, the lack of anything that the Court could construe as indicating impairment of faculties as far as the ability to think and speak goes.

"The Court finds that the statements, each and every statement of the defendant, were made freely and voluntarily and were made intelligently. The Court further finds that the waivers of defendant's rights as enunciated to him were made freely and voluntarily and intelligently."

This ruling applied not only to the statements we have discussed thus far but also to the two subsequent statements given at the jail and discussed immediately *infra*.

[8]Appellant's brief inaccurately indicates that the two statements at the jail took place on the same day.

were so, of course, he would have a good argument. However, the factual findings of the court quoted in footnote 7, *supra,* as to the voluntary nature of defendant's statements related to this claim of defendant as well as a claim that his drinking made his *Miranda* waivers defective. On the page of the reporter's transcript immediately preceding the court's remarks set out in footnote 7, *supra,* defense counsel expressly referred to the contention that defendant was under the influence of medication as well as intoxicants. This contention raises a question of fact as did the preceding one concerning the use of alcohol. "The court in this case observed the witness . . . , heard him testify, heard and saw the officers testify with reference to whether [he] made an intelligent waiver of his privileges and rights. It is a question of fact and the judge is the person under the circumstances in this case to ascertain the credibility of the witnesses. Upon substantial evidence the court found that [defendant] had willingly, voluntarily and intelligently waived his rights." (*People* v. *Drumgo,* 269 Cal. App.2d 479, 482 [74 Cal.Rptr. 761].)

■ Here the deputies interviewed defendant at the jail, testified that he understood and made meaningful responses to questions asked of him and that nothing indicated that defendant was anything but rational. ■■■ That is substantial evidence to support the court's finding.[9]

■ Finally, with respect to the 8 p.m. confession on February 28 defendant argues that it should have been excluded because he had exercised his right of silence. His claim is that he had revoked his *Miranda* waivers at the time and therefore could not be further questioned. (Cf. *People* v. *Fioritto,* 68 Cal.2d 714 [68 Cal.Rptr. 817, 441 P.2d 625].) This claim is based on the fact that at the 11 a.m. conversation on February 27 defendant said "I have something very serious to talk to you about and would like to talk to you again at a later time." When asked why he

---

[9]In connection with his argument that drugs administered to him affected the voluntariness of his waivers, defendant collaterally complains that the court refused to admit into evidence pages of a work entitled Physicians' Desk Reference dealing with the drugs that had been given to him. Defendant argues that all relevant evidence is admissible unless precluded by statute (Evid. Code, § 351) and that the book in question was evidence within the statutory definitions. The court correctly excluded the book. The record indicates that the reference listed the various uses and potential side effects of the medication in question. However, as the court remarked, medical testimony from a competent source as to the reasons for the drugs being prescribed and the effect of the drugs on the particular patient was required. Further, the court made it clear that while it was not trying to foreclose the defense from showing what effect the drugs had there should be some evidence as to what the drugs did do to defendant under the conditions that he found himself in. In the abstract the proffered evidence was simply not relevant. Indeed, if introduced, as apparently was the intention of the defendant, to prove the truth of what was said in the book, the contents would be hearsay. We find no error in refusing to admit this evidence.

did not want to talk then, defendant stated "he wanted to think about it awhile." Of course it would not have been proper for an officer to press on the subject at the 11 a.m. conversation. Defendant's statement appears on its face not to be a claim that he wished to remain silent forever but simply that he wanted to think about talking further. At the 8 p.m. conversation the next day, defendant was again read his *Miranda* rights, and again waived them. We perceive no error in admitting the testimony.

## Identification Contentions

Defendant urges that the trial court should have suppressed an identification of him made by Helen Mason the victim of one of the robberies. The contention is that the "photographic I.D. procedure was impermissibly suggestive" and that defendant had a right to counsel at the time the photographs were shown to the witness. As the People indicate, defendant's latter contention is without merit. (*People* v. *Lawrence,* 4 Cal.3d 273 [93 Cal.Rptr. 204, 481 P.2d 212].) This is not the court to accede to the suggestion in defendant's reply brief that *Lawrence* be reconsidered.

As to the argument that the photographic procedure was impermissibly suggestive, it is difficult to understand precisely the nature of the contention. Defendant merely states that Mrs. Mason testified that she was shown a set of photographs in late February and that although she tentatively picked defendant's picture out of the set, she was unable to positively identify him. Defendant does not attack the selection of photographs. The court heard testimony outside of the presence of the jury on this issue and resolved it against defendant. We have not been told why the photographs were unfair.

Defendant also complains that the witness in question was told by a sheriff's officer that defendant was the suspect in custody. That is not quite the testimony. The witness testified, before the jury and sometime after the court had overruled the motion to suppress her identification testimony, that after she had said with respect to a photograph of defendant that it could be the robber but that she was not absolutely positive, the deputy told her that the person in the picture was the suspect in a murder. The statement should not have been made but it created no harm. The witness was trying to identify defendant for a robbery, not for a murder. More importantly she persisted in testifying before the jury, that after being told the person was a murder suspect she was still unable to make a positive identification.

Continuing with her testimony at the hearing on the motion to suppress, this witness testified that to the extent that she could identify defendant it was not from his face but rather simply from his "build"

and that she was never able to identify a face. Defendant's attack in essence goes not to the fairness of identification procedure but to the jury's consideration of the credibility of the witness' identification. Accordingly, we find no merit in defendant's collateral contention that his statement confessing to the robbery on the evening of February 28 was induced by the identification procedure and therefore must be suppressed.

### Re-reading of Transcript of Opening Argument of District Attorney

After the deputy district attorney presented his opening satement, two jurors were excused because of illness and financial hardship. Four additional alternate jurors were selected and two of the alternates were chosen by lot to fill the two vacant positions of the jury. One of the new jurors was not on the jury when the deputy district attorney presented his opening statement. Therefore, with the prosecutor's and with defense counsel's concurrence at a time when defendant was present, the court ordered the new juror and the new alternates to return and the opening satement was read to the new juror and alternates by the reporter. The judge, defense counsel and defendant were not present at the reading and defendant was never personally asked whether he approved of the procedure.

In approving this procedure defense counsel said, "I think both reporters are eminently qualified, experience-wise, and everything else, to read the testimony as it is reflected in the transcript, and I do not even think it is necessary that the other reporter take down this reading. I think if one of the reporters reads it to them in the jury room, that would be satisfactory. I don't think the Court or counsel have to be present." Counsel then stipulated to so proceed.

Based on these facts defendant argues that he did not personally waive his right to have counsel present during the reading of the statement to the jury, that the court had to be present so as to be able to "exercise control" and that he did not waive his right to be present himself at this part of the trial.

As to the first branch of the claim—that defendant failed to waive his right to have an attorney present during the re-reading of the opening statement to the four jurors and that he therefore was deprived of his right to counsel—we recognize of course the constitutional right to counsel that each criminal defendant has and the necessity for his personally waiving that right (e.g., *In re Saunders*, 2 Cal.3d 1033, 1041 [88 Cal.Rptr. 633, 472 P.2d 921]; *In re Cowans*, 2 Cal.3d 733, 737 [87 Cal.Rptr. 499, 470

P.2d 635]; *People* v. *Floyd,* 1 Cal.3d 694, 702-703 [83 Cal.Rptr. 608, 464 P.2d 64]; *In re Johnson,* 62 Cal.2d 325, 334 [42 Cal.Rptr. 228, 398 P.2d 420]). The absence of counsel here however, is scarcely comparable to the deprivation of rights which occurred in the famous *Scottsboro* case upon which defendant relies (*Powell* v. *Alabama,* 287 U.S. 45 [77 L.Ed. 158, 53 S.Ct. 55, 84 A.L.R. 527]). Without pausing further to examine the matter and assuming that error occurred in not securing defendant's personal waiver to counsel's absence during the re-reading of the opening statement to the four jurors in question, we hold that the error was clearly harmless beyond a reasonable doubt. (*Chapman* v. *California,* 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065].)

■ As to the absence of the court from the re-reading we hold that counsel's consent to the procedure was itself adequate. We know of no reason why in light of the circumstances the court's presence was necessary if counsel himself did not desire to be there.

■ Finally, as to the failure to secure defendant's waiver as to his own personal presence, clearly it would have been better to secure defendant's personal agreement to the procedure. However, the cases under Penal Code section 1043, which statute requires the presence of a defendant at some (but not all) of the proceedings in his trial, hold that his presence is required only at those stages of the trial in which a defendant's substantial rights may be affected. (*People* v. *Boehm,* 270 Cal.App.2d 13, 19, 20 [75 Cal.Rptr. 590] (meeting in judge's chambers before a trial where immunity was given to a codefendant); compare *In re Lessard,* 62 Cal.2d 497, 506 [42 Cal.Rptr. 583, 399 P.2d 39] with *People* v. *Blye,* 233 Cal.App.2d 143, 149, 150 [43 Cal.Rptr. 231] (defendant's absence from chambers conference—the test in each case held to be whether the absence bore a reasonable relationship to a full opportunity to defend himself and impaired his right to a fair trial).) Defendant does not claim any specific prejudice from his absence. Defendant's absence here in no way affected any substantial rights and if any error occurred it was harmless beyond a reasonable doubt.

### Evidence of Decedent's Mental State

In connection with the murder count, evidence was admitted over objection that the victim had told her husband that if she was robbed she would be afraid and would give the robber the money. The defendant objected to this testimony on hearsay grounds. The People argued for its admission under Evidence Code section 1250, asserting that the decedent's state of mind was in issue. The argument was that the evidence supported

an inference that while she would not resist a robbery she would resist a robbery with sexual advances. Since the evidence in connection with some of the other robbery counts showed sexual advances and since count II involving the robbery of the murder victim alleged that it was perpetrated with the intent to inflict great bodily injury upon her, the People contend the evidence was admissible.

 We do not believe that section 1250 warranted admissibility of this evidence on the ground that the decedent's state of mind was in itself in issue in this action. However the section also allows such statements to be admitted into evidence when offered to prove acts or conduct of the decedent. (*People* v. *Ireland,* 70 Cal.2d 522, 529-532 [75 Cal.Rptr. 188, 450 P.2d 580, 40 A.L.R.3d 1323].) While the suggested inference is weak, it is a tenable one. Because of the "great bodily injury" allegation we hold that it was not error to admit the testimony.

### Evidence of Other Crimes

The next contention relates to the fact that in a tape recording of one of defendant's statements concerning the crime played to the jury, defendant admitted that he used narcotics and that he had committed two robberies in Colorado. These statements he now urges show neither motive, opportunity, intent or any other factors enumerated in section 1101, subdivision (b), of the Evidence Code and should not have been admitted. Defendant then states that to introduce evidence of these crimes was highly prejudicial. The defendant moved for a mistrial after the tape recording had been played to the jury stating that the prosecution was under an affirmative duty to keep the evidence away from the jury. The People argued in return, and argue similarly on appeal, that defendant had a copy of the transcriptions of his tape-recorded statements for a number of months prior to trial. The suggestion is that defendant could not let his statement first be heard by a jury and then move for a mistrial. In denying the motion the trial court stated, "Very well. The Court finds that the alleged improper portions of the transcript, even if improperly admitted, were not of such a nature as to prejudice the defendant to the point where he could not have a fair trial."

The court further stated that it would be willing, if defense counsel desired, to admonish the jury to disregard the objected-to portions of the tape recording. Counsel felt that at that stage the less said the better and declined to request the admonishment. The trial court indicated the statements in question were "almost an off-hand remark by the defendant."

We believe they were a bit stronger than that since they indicated not only that defendant had "pulled" two robberies in Colorado but also that he was a narcotic addict and that he was getting his money to support his habit by "stealing" and "hustling" and by "dealing in dope." However, we see no reason why the latter testimony was not admissible under section 1101, subdivision (b). (*People* v. *Martin,* 247 Cal. App.2d 416, 421 [55 Cal.Rptr. 629].)

Reference to the two Colorado robberies, however, should have been deleted. The precise question asked defendant was whether he had pulled any robberies in the Long Beach or Los Angeles area in January of 1971 prior to committing himself to a state hospital on account of his narcotic addiction. The defendant's answer was "No. Two in Colorado. None in Los Angeles." This statement we agree was clearly an "off-hand remark" whose admission was nonprejudicial error whether considered singularly or cumulatively with any other of the matters about which the defendant complains.

### Helpful Assistance of Counsel at Trial

Perhaps confusing wordiness with effectiveness, appellate counsel argues that his trial brother was ineffective because he presented no argument during the guilt trial.[10] Clearly trial counsel was correct, as the life sentence returned by the jury established. The trial was by no means reduced to a farce or a sham. (*People* v. *Ibarra,* 60 Cal.2d 460, 466 [34 Cal.Rptr. 863, 386 P.2d 487].)

### Instructions on Manslaughter

Defendant argues that the trial court erred in not giving instructions offered by him on the subject of manslaughter, including the so-called "*Conley*" instruction. (*People* v. *Conley,* 64 Cal.2d 310, 324-326, fn. 4 [49 Cal.Rptr. 815, 411 P.2d 911].) This contention involves the complex subject of the kinds of instruction required where diminished capacity to form a specific mental intent is the issue in a homicide case.

We have concluded first, that on the facts of this case where the evidence points unerringly to the felony-murder theory by reason of robbery as the only possible theory of homicide, and where robbery in connection with the homicide has been charged and has been found to

---

[10]This argument might be contrasted with defendant's earlier contention in complaining of the consolidation of the two informations, that counsel made a tactical choice not to argue.

have occurred under proper jury instructions, manslaughter instructions are not required either as to the traditional or *Conley* type of manslaughter. We have also concluded that even if error occurred in the failure to give a manslaughter instruction on account of defendant's diminished capacity that such error was not prejudicial.

To set forth the reasons for our conclusions it is necessary to discuss some of the law which has developed concerning diminished capacity by way of intoxication following *People* v. *Conley, supra,* 64 Cal.2d 310. In *People* v. *Castillo,* 70 Cal.2d 264, at page 269 [74 Cal.Rptr. 385, 449 P.2d 449], the Supreme Court approved the following explanation of the *Conley* decision, set forth in *People* v. *Aubrey,* 253 Cal.App.2d 912, 918-919 [61 Cal.Rptr. 772]: " 'In *Conley,* a conviction of first degree murder was reversed because of the failure of the trial court to instruct on manslaughter. The defendant had testified that he did not intend to kill and he could not remember what he had done. A blood test showed alcohol sufficient for intoxication. The opinion points out that evidence of intoxication may be considered by the jury to rebut malice. Referring to an earlier case, the court said (at p. 318): "We thus gave effect to the statutory requirements for the offense of manslaughter, 'the unlawful killing of a human being without malice,' and recognized that since the statute had been enacted before the concept of diminished capacity had been developed, its enumeration of nonmalicious criminal homicides did not include those in which the lack of malice results from diminished capacity. That enumeration could not be exclusive, for in the absence of malice a homicide cannot be an offense higher than manslaughter. [Citations.] Accordingly, a finding of provocation sufficient to reduce murder to manslaughter is not the sole means by which malice can be negated and voluntary manslaughter established. A person who intentionally kills may be incapable of harboring malice aforethought because of a mental disease, defect, or intoxication, and in such case his killing, unless justified or excused, is voluntary manslaughter." ' "

Numerous cases have therefore held that it was error to fail to give instructions regarding manslaughter where the evidence supported a contention that there was diminished capacity by reason of intoxication or some other cause, even though instructions were given as to the effect of diminished capacity on a charge of murder. (E.g., *People* v. *Mosher,* 1 Cal.3d 379, 390 [82 Cal.Rptr. 379, 461 P.2d 659]; *People* v. *Castillo, supra,* 70 Cal.2d 264, 268-271; *People* v. *Aubrey, supra,* 253 Cal.App.2d 912, 917, 921; *People* v. *Griffin,* 18 Cal.App.3d 864, 866, 870 [96 Cal. Rptr. 218]; *People* v. *Cobas,* 12 Cal.App.3d 952, 956 [91 Cal.Rptr. 110]; see *People* v. *Ford,* 65 Cal.2d 41, 58 [52 Cal.Rptr. 228, 416 P.2d 132];

*People* v. *Asher,* 273 Cal.App.2d 876, 891-898 [78 Cal.Rptr. 885]; *People* v. *Sievers,* 255 Cal.App.2d 34, 38-39 [62 Cal.Rptr. 841].)

Turning specifically to a case where the felony-murder rule is invoked and diminished capacity is raised as a defense, manslaughter instructions must be given if there is a factual dispute as to whether the homicide was committed during perpetration of the underlying felony or where diminished capacity or intoxication are urged as a defense to the underlying felony charge as well as to the murder charge. (*People* v. *Ford, supra,* 65 Cal.2d 41, 58-59, and fn. 9; *People* v. *Mosher, supra,* 1 Cal.3d 379, 392; *People* v. *Ketchel,* 71 Cal.2d 635, 641 [79 Cal.Rptr. 92, 456 P.2d 660].)

We pause in our discussion to set forth in the margin the instructions bearing on intoxication and diminished capacity which were given in this case.[11] Defendant proposed, but the trial court refused to

---

[11]CALJIC instructions appearing in clerk's transcript:

CALJIC No. 2.02:

"The specific intent with which an act is done may be manifested by the circumstances surrounding its commission. But you may not find the defendant guilty of the offenses charged in [Counts II, III, IV, V, VII, & IX (the robbery counts)] unless the proved circumstances not only are consistent with the hypothesis that he had the specific intent to permanently deprive the owner of his property but are irreconcilable with any other rational conclusion."

CALJIC No. 3.34:

"The intent with which an act is done is shown by the circumstances attending the act, the manner in which it is done, the means used, and the soundness of mind and discretion of the person committing the act."

CALJIC No. 4.21:

"In the crime of robbery of which the defendant is accused [in Counts II, III, IV, V, VII & IX of the information] a necessary element is the existence in the mind of the defendant of the specific intent to permanently deprive the owner of his property.

"If the evidence shows that the defendant was intoxicated at the time of the alleged offense, the jury should consider his state of intoxication in determining if defendant had such specific intent.

"If from all the evidence you have a reasonable doubt whether defendant was capable of forming such specific intent, you must give the defendant the benefit of that doubt and find that he did not have such specific intent."

CALJIC No. 4.22:

"Intoxication of a person is voluntary if it results from his willing partaking of any intoxicating liquor, drug or other substance when he knows that it is capable of an intoxicating effect or when he willingly assumes the risk of that effect as a possibility."

CALJIC No. 8.21:

"The unlawful killing of a human being, whether intentional, unintentional or accidental, which occurs as a result of the commission of or attempt to commit the crime of robbery, and where there was in the mind of the perpetrator the specific

give, instructions dealing with deliberate and premeditated murder (CALJIC Nos. 8.20 and 8.30) and with manslaughter (CALJIC Nos. 8.39, 8.40, 8.41, 8.72, 8.73) as well as part of the so-called *Conley* instruction.

As to the circumstances of the killing the only evidence presented to the jury was that it occurred during the course of a robbery. This evidence consisted not only of testimony of police officers and others concerning the discovery of the body of the victim in her store and the condition of the cash register but also of defendant's own tape-recorded confession played to the jury that he went to the store "specifically to rob it." Our attention has not been directed to any testimony which would support a finding of murder on any theory other than the robbery felony-murder rule. Indeed, defendant does not complain that the trial court refused to give his proposed instructions on deliberate and premeditated murder.

As can be seen from the instructions which were given, the trial court fully instructed as to the necessity to find that defendant had a specific intent to permanently deprive the owner of property before defendant could be convicted of robbery, and that the jury should take into account defendant's intoxication and whether he was suffering from any abnormal mental or physical condition which prevented him from forming that specific intent or any mental state essential to constitute the crime with which he was charged. In a homicide case the effect of the felony-murder rule is "to posit the existence of malice aforethought *and* to classify the offense as murder of the first degree in homicides which are the direct causal result of those six felonies [robbery being one of them] specifically

---

intent to comit such crime, is murder of the first degree.

"The specific intent to commit robbery and the commission or attempt to commit such crime must be proved beyond a reasonable doubt."
CALJIC No. 9.10:

"Robbery is the taking of personal property of any value in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear and with the specific intent permanently to deprive the owner of his property."
CALJIC No. 3.35:

"When a defendant is charged with a crime which requires that a certain specific intent or mental state be established in order to constitute the crime or degree of crime, you must take all the evidence into consideration and determine therefrom if, at the time when the crime allegedly was committed, the defendant was suffering from some abnormal mental or physical condition, however caused, which prevented him from forming the specific intent or mental state essential to constitute the crime or degree of crime with which he is charged.

"If from all the evidence you have a reasonable doubt whether defendant was capable of forming such specific intent or mental state, you must give defendant the benefit of that doubt and find that he did not have such specific intent or mental state."

enumerated in section 189 of the Penal Code." (*People* v. *Ireland,* 70 Cal.2d 522, 538 [75 Cal.Rptr. 188, 450 P.2d 580, 40 A.L.R.3d 1323].)

The reasoning underlying *Conley* and its predecessors (*People* v. *Wells,* 33 Cal.2d 330 [202 P.2d 53]; *People* v. *Gorshen,* 51 Cal.2d 716 [336 P.2d 492]) is that diminished responsibility or diminished capacity of a defendant may negate the specific intent or other mental state involved, and that malice is a mental state which is a necessary element of both degrees of murder. Therefore, if by reason of an alcoholic or otherwise induced diminished mental faculty, a defendant cannot achieve the necessary mental state which constitutes malice or cannot form a specific intent where one is required, he cannot be guilty of a crime requiring those elements. (*People* v. *Conley, supra,* 64 Cal.2d 310, 318, 320.)

The only mental state pertinent to the case at bench was the specific intent required to rob the murder victim. The jury was correctly instructed that it should consider the claimed diminished capacity of the defendant to form the specific intent to rob. The jury convicted him of robbery. It must therefore be presumed that they found that he had the requisite mental ability to form that specific intent.[12] These circumstances distinguish this case from others where it has been held error, even in a felony-murder context, to refuse manslaughter instructions. Thus in *People* v. *Mosher, supra,* 1 Cal.3d 379, the jury had not been instructed that diminished capacity might rebut the specific intent necessary to perpetrate the felonies there underlying the felony-murder doctrine. The same is true in *People* v. *Ketchel, supra,* 71 Cal.2d 635, 641 and *People* v. *Griffin, supra,* 18 Cal.App.3d 864, 868.

We have already referred to the footnote in *People* v. *Ford, supra,* 65 Cal.2d 41, 58, to the effect that under *Conley,* manslaughter instructions must be given although the felony-murder rule is involved if there is any factual dispute as to whether the homicide was committed during the perpetration of a relevant felony or where the issue of diminished capacity or intoxication is raised as a defense to the felony charge as well as to the murder charge. There had been a prior appeal in *Ford* (60 Cal.2d 772 [36 Cal.Rptr. 620, 388 P.2d 892]) decided prior to *People* v. *Conley, supra,* 64 Cal.2d 310, in which the Supreme Court held that it was not error to refuse to give manslaughter instructions since the homicide in *Ford* was, as a matter of law, at least murder in the second degree. In the

---

[12]From the fact that the court gave diminished capacity instructions it is clear that the trial court had been "alerted by the evidence presented" that diminished capacity was an issue in the case and was of the opinion that there was sufficient evidence of intoxication for the jury to consider that issue. (*People* v. *Castillo, supra,* 70 Cal.2d 264, 270; *People* v. *Griffin, supra,* 18 Cal.App.3d 864, 870.)

subsequent appeal, by which time *Conley* had been decided, the court said, ". . . The rule that was announced in *Conley,* however, is inapplicable to the facts in the present case. As noted in *Conley,* manslaughter instructions may not be necessary in a case in which diminished capacity and intoxication are relied on by the defense if the felony-murder rule is involved. (*People* v. *Conley, supra,* at p. 324, fn. 4.) Thus, *Conley* does not alter the rule, articulated by Justice Schauer on the previous appeal, that a homicide found to have 'been perpetrated during the commission of certain felonies cannot be less than murder of the second degree." (*People* v. *Ford, supra,* 65 Cal.2d 41, at p. 58.)

*Conley* itself pointed out that its celebrated suggested' instruction (fn. 4, 64 Cal.2d 310, at p. 324) was for a case "in which diminished capacity and unconsciousness because of voluntary intoxication are relied on by the defense, *the felony murder doctrine is not involved,* and there is no evidence of poisoning, torture, or lying in wait, . . ." (Italics supplied.)

This rationale was discussed in *People* v. *Asher, supra,* 273 Cal.App.2d 876. There the underlying felony was a violation of Penal Code section 12021 (possession of a gun by an ex-convict).[13] In *Asher* the uncontradicted evidence showed that a bar manager was killed during the course of a robbery. The court held that there was no error in instructing on ordinary manslaughter. One of the defendants urged that because there was evidence of diminished capacity, a *Conley* instruction was required. The Court of Appeal concluded that it was the duty of the trial court to give the instruction *sua sponte* where it was warranted by the evidence. The court further recognized that where the jury has found a defendant guilty of first degree murder "logically it is difficult to find prejudice because of errors in instructions on an offense of lesser dignity than second degree murder, when the jury rejected the latter charge and found first degree murder." (*People* v. *Asher, supra,* 273 Cal.App.2d 876, at p. 896.) (For a similar proposition see *People* v. *Aubrey, supra,* 253 Cal.App.2d 912, 919.)

However, the court in *Asher* recognized that the Supreme Court nevertheless required *Conley* instructions where warranted under the evidence. " 'It is . . . settled that defendant's right to a manslaughter instruction when there is evidence thereof precludes not only our weighing that evidence to determine the likelihood that a properly instructed jury would

---

[13]*Asher's* reasoning as to the specific felony involved (Pen. Code, § 12021) is probably no longer valid (see *People* v. *Satchell,* 6 Cal.3d 28, 29 [98 Cal.Rptr. 33, 489 P.2d 1361]) but the validity of *Asher's* underlying approach to the problem discussed here is not challenged.

have found manslaughter, but also our attempting to determine how the failure to present the issue of manslaughter to the jury may or may not have influenced its choice between first and second degree murder. Since we do not know what effect an instruction that the jury could return a verdict of manslaughter would have had on its deliberations, we cannot conclude that it necessarily rejected the evidence of manslaughter. Defendant was entitled to a jury trial on all of the issues presented by the evidence, and that right he was denied.' " *(People* v. *Asher,* 273 Cal.App.2d 876 at p. 897.)

Turning to the facts before it in *Asher,* the Court of Appeal pointed out that the issues of diminished capacity and intoxication were raised as a defense to the robbery charge and that the jury was fully instructed on those issues. *(People* v. *Asher,* 273 Cal.App.2d 876 at p. 899.) The court, however, then did not hold that no *Conley* instruction was required but rather ruled that "even though it were error" to fail to give the instruction the failure was not prejudicial.

While we agree with and will briefly discuss below the assertion that no prejudice occurred from failing to give a *Conley* instruction, we also hold that no such instruction was required here. As in *Asher,* the only mental state required to be proved to establish first degree murder was the mental state involved in the specific intent to commit robbery. Malice is subsumed in the felony-murder doctrine. *(People* v. *Ireland, supra,* 70 Cal.2d 522, 538.) Given the defendant's admission and the other overwhelming evidence, that defendant was in the store where the murder occurred for the purpose of committing a robbery, also given the absence of any evidence to the contrary, and further given the fact that the jury was properly instructed as to the effect of diminished capacity on his ability to form the specific intent required in robbery, there simply is no room for the *Conley* concept to operate so as to require further manslaughter instructions.

Even if we were wrong in this assumption, however, *People* v. *Asher, supra,* 273 Cal.App.2d 876 and *People* v. *Sievers, supra,* 255 Cal.App.2d 34, clearly show that any error would have to be regarded as nonprejudicial. We have already discussed *Asher.* *Sievers* involved a murder and robbery charge in which proposed *Conley* manslaughter instructions were refused by the court. *Sievers* held that it was error to refuse the manslaughter instructions and that the trial court had erred in telling the jury that defendant was either guilty of murder in the first degree or entirely innocent. The court concluded, "Despite the error, however, appellant

suffered no prejudice. The jury was fully and fairly instructed on the defense of diminished capacity. The court's instructions ran both to the murder and robbery charges. The jury found appellant guilty of robbery. It thus rejected his claim of diminished capacity as to this offense. Since appellant's victim met his death in the course of the robbery, the felony-murder rule is applicable, and appellant was properly found guilty of first degree murder. The court's comment, to the effect that appellant was either innocent of any homicide or guilty of first degree murder, was therefore harmless." (P. 39.) A similar lack of prejudice occurred in the instant case.

### Errors in Disposition

The judgment recited that appellant was found to have been armed in counts II, III, IV, V, VII, and IX (the robbery counts) and the degree of offense in each of these was fixed as being in the first degree. The People concede that under *People* v. *Floyd,* 71 Cal.2d 879 [80 Cal.Rptr. 22, 457 P.2d 862], the judgment should be modified to eliminate the "armed" finding. Further, the judgment reads that at the time of the commission of the offenses charged in count II (the robbery connected with the murder) the defendant was armed, but the information itself contains no similar allegation. While the People concede that this finding appears to be erroneous (*People* v. *Washington,* 243 Cal.App.2d 681, 686-687 [52 Cal. Rptr. 668]) they point out that the issue was fully tried, unlike the situation in *Washington.* The trier of fact found upon the question and in his confession defendant admitted being armed. We believe the failure to allege that he was armed is harmless error because, as the People also suggest, "Lastly, although appellant does not raise the issue, the sentence on Counts I and II may be violative of Penal Code section 654." We agree with that contention.

The judgment as to counts II, III, IV, V, VII, and IX is modified to recite that as to those counts Penal Code sections 3024, 12021 and 12022.5[14] are inapplicable but that defendant was armed with a deadly weapon at the time of the commission of these offenses within the meaning of Penal Code section 1203. The judgment is modified to stay the sentence under count II for so long as the judgment under count I remains in full force and effect. As thus modified, the judgment is affirmed.

Kaus, P. J., and Stephens, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied May 23, 1973. Mosk, J., was of the opinion that the petition should be granted.

---

[14]Penal Code section 12022.5 is inapplicable since a knife not a firearm was used by defendant in committing the crimes involved.