[No. B075521. Second Dist., Div. Seven. Nov. 21, 1994.]

THE PEOPLE, Plaintiff and Respondent, v.
MARC LANCE NEUFER, Defendant and Appellant.

**COUNSEL**

Elinor Dejez Burton, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General, Pamela C. Hamanaka, and Emilio E. Varanini IV, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**WOODS (Fred), J.**—Before trial appellant admitted two alleged felony convictions—a 1991 robbery conviction in Los Angeles County and a 1988 receiving stolen property conviction in Ohio. After trial, a jury convicted appellant of robbery (Pen. Code,[1] § 211), and he was sentenced to an 11-year state prison term.

On appeal, appellant contends the trial court erred by conferring with the jury in the absence of defense counsel and by coercing the jury's verdict. We find defense counsel expressly waived his presence during testimony read-back, the one jury question answered by the trial court in the absence of defense counsel was answered correctly and if error, was harmless, and there was no jury coercion. We affirm the judgment.

### FACTUAL BACKGROUND

There being no insufficiency of evidence claim, the facts may be stated simply. Our perspective favors the judgment. (*People* v. *Barnes* (1986) 42 Cal.3d 284, 303-304 [228 Cal.Rptr. 228, 721 P.2d 110].)

About 7 p.m. on September 28, 1992, Robert Rosen, the victim, went to Hunter's, a gay bar in West Hollywood. Within two or three minutes appellant approached the victim and said something to him. Even though appellant was standing only about two feet in front of the victim he couldn't understand what appellant said because the music was very loud. The victim, who didn't want to talk to appellant, said he had to go home, got up, and started to leave. Appellant preceded him out of the bar.

As the victim walked toward the parking lot where his car was parked, appellant and a Black man with a turban stood on the parking lot steps. When the victim tried to walk between them appellant said "You are going to have to give it up," grabbed the victim, got him in a headlock, and dragged him into the alley by the bar. The Black man punched the victim in the face. The victim struggled and yelled but appellant and the Black man took his wallet.

---

[1]Statutory references, unless otherwise noted, are to the Penal Code.

Robert Burns, whose apartment was in the Hunter's Bar building, heard the struggle and looked out his kitchen window but couldn't see the victim or his assailants. Because he continued to hear the sounds of someone being beaten, Mr. Burns yelled "Stop it—I have already called the Sheriff." He then saw appellant and the Black man walk from the alley into view, stop, and look to see where the yell had come from. They stood about 10 feet away in the well-lighted walkway for 30 to 40 seconds, looking directly at Mr. Burns's dark window.

Appellant and the Black man then left.

The police responded to the robbery scene, obtained descriptions of the robbers from the victim and Mr. Burns, but were unable to find the robbers.

Appellant was arrested in the neighborhood a few days later, on October 2, when the victim saw appellant and contacted the police. Appellant first gave a false name to the police before giving his true name.

The victim was positive in his identification of appellant who was six feet four inches, had a blond ponytail, and was usually with his transvestite lover, Robert Salas, a stocky Hispanic with a high pompadour who sometimes wore spandex pedal pushers and a halter top. The victim had seen appellant two days before the robbery when appellant was with Robert Salas in Hunter's Bar. The victim had also seen appellant in the neighborhood after the robbery, on October 1 near Plummer Park and again by a bus stop where appellant robbed a middle-aged man (Edmund Tyler) and again on October 2 when appellant was with Robert Salas.

Mr. Burns was equally positive in his identification of appellant. He too had seen appellant before and after the robbery, twice before the robbery when appellant was hugging and kissing Robert Salas and once after the robbery when appellant suddenly approached him at a bus stop.

Appellant did not testify. The defense consisted of the preliminary hearing testimony of Edmund Tyler that he was robbed on October 1 by someone at least six feet three inches, quite blond, with pronounced cheekbones and he didn't think appellant was the robber. Robert Salas also testified that he was "always" with appellant on September 28, the robbery date, but couldn't remember if appellant might have left the Sunset 8 Motel that evening to go to the store.

## Discussion

### 1. *Trial court conferring with jury in absence of defense counsel*

Appellant contends the trial court erred twice, first by having a "dialogue with the jurors about [their requested] readback" and second by answering a juror's question—both in the absence of defense counsel.

This is what occurred. On March 16, when the jury began deliberations, defense counsel informed the trial court (in Santa Monica) he had a case trailing for trial in Pomona but wanted to be available if the instant jury had questions. Defense counsel requested the trial court to order him *not* to become engaged in trial on March 17. The trial court issued the order.

Despite the order, on March 17 defense counsel did become engaged in trial in Pomona[2] and thus was unavailable when the jury requested witness readback.

On March 17, in open court, out of the presence of the jury, with appellant and the prosecutor present, the trial court informed the parties of the jury's readback request. The trial court also stated "I have spoken to Mr. Catalano [defense counsel] who has said to me that its agreeable with him to simply send the reporter into the jury room to read the testimony that the jury has requested." The trial court indicated he made defense counsel "aware of what [the jury] ha[d] requested" and had "discussed" the matter with defense counsel.

The trial court then asked if this procedure was agreeable with the prosecutor and with appellant. Both said it was. Notwithstanding appellant's personal acceptance of this procedure, the trial court asked appellant if he would like to talk to defense counsel on the phone "about this." When appellant said he would, the trial court stated the "[r]ecord will indicate I'm calling Mr. Catalano in Pomona to give his client the opportunity to speak with him . . . [and] I have now put Mr. Neufer on the line with Mr. Catalano."

After a pause in the proceedings, while appellant spoke with his attorney, the trial court again asked appellant if the readback procedure, without the presence of defense counsel, was acceptable to him. Appellant said it was.

The trial court had the jury brought into court and read aloud their note, as follows: "We, the jury in the above entitled action, request the following: 1. Testimony of Edmund Tyler. 2. Mr. Rosen's testimony in Hunter's Bar and as he left the premises."

---

[2]No explanation for this occurrence is provided in the record.

The trial court then asked, "this request about Mr. Rosen's testimony, are you requesting the testimony from the beginning up to what point?" The requesting juror [Ms. Martinez] answered "[f]rom inside the bar to the back of the gate. Just—just before he was mugged" and confirmed it was "[w]hen he got to the top of the stairs from—leading to the parking lot."

Having determined what testimony the jury wanted read, the trial court explained to the jury the procedure that would be followed: the court reporter who reported Mr. Rosen's testimony would go into the jury room with them and read the requested testimony, the jury would listen, take notes if they cared to but not engage in discussions with each other, that court reporter would leave the jury room, the reporter who reported Mr. Tyler's testimony would enter the jury room and read his testimony, that reporter and the alternate jurors would then leave the jury room, and the jurors would resume their deliberations.

Immediately following this explanation Juror Gordon said she had a question and this colloquy occurred.

"JUROR GORDON: Well, I had the question about Mr. Tyler's testimony, but also I wanted to know in the legal way that discrepancies in the testimony, is that enough cause for a reasonable doubt.

"THE COURT: That's something for the juror to decide.

"JUROR GORDON: Okay.

"THE COURT: I can only refer you to the instruction that deals with discrepancies between one witness' testimony and another. It outlines it's something to be considered, whether it's a fact of importance or a trivial detail, that you have to consider. It's up to you to make those decisions."

■ We now consider appellant's claim that the trial court erred by bringing the jury into the courtroom, asking them what part of Mr. Rosen's testimony they wanted read, and explaining the readback procedure to them. Appellant asserts "the waiver of counsel's presence did not extend farther than for the trial court to 'simply send the reporter into the jury room to read the testimony that the jury has requested.'" Appellant's claim does not bear scrutiny.

Section 1138[3] prescribes that when a jury wants testimony read or a legal question answered they shall be "conduct[ed] . . . into court." The trial court, by bringing the jury into the courtroom, merely complied with this statutory mandate.

As to the trial court asking the jury what part of Mr. Rosen's testimony they wanted read, there was no error. As the trial court indicated, it had informed defense counsel of the jury's request and discussed that request with defense counsel. Because the request concerning Mr. Rosen's testimony was obviously unclear ("Mr. Rosen's testimony in Hunter's Bar and as he left the premises"), defense counsel, by agreeing to have the *requested* testimony read in his absence, also agreed to have the trial court determine what readback testimony was requested. Such jury request clarifications are both common and essential. Under the instant circumstances it defies common sense to suggest defense counsel agreed to the requested readback but not to determining *what* readback was requested. The improbability of this suggestion is underscored by defense counsel's failure to object to the trial court's clarification when defense counsel was present the next morning, March 18, or afternoon (when the verdict was received), or 12 days later, March 30, at the probation and sentence hearing.[4]

Similarly, defense counsel impliedly agreed to having the trial court explain the readback procedure to the jury in his absence. That explanation was designed to protect appellant's rights by ensuring, for example, the jury did not conduct deliberations in the presence of the court reporter. Such explanations are also common and essential and defense counsel made no objection to the explanation at any post-readback proceeding.

The second claimed error—the trial court's answering Juror Gordon's question concerning discrepancies and reasonable doubt—is another matter. We agree with appellant that defense counsel's consent to having testimony read back in his absence did *not* embrace having jury questions—not yet asked or formulated—answered in his absence. Section 1138 (see fn. 3) requires that counsel be given notice of information requested by the jury. The trial court, by answering the juror's question without first notifying

---

[3]The section reads: "After the jury have retired for deliberation, if there be any disagreement between them as to the testimony, or if they desire to be informed on any point of law arising in the case, they must require the officer to conduct them into court. Upon being brought into court, the information required must be given in the presence of, or after notice to, the prosecuting attorney, and the defendant or his counsel, or after they have been called."

[4]Appellant's suggestion that had defense counsel been present he might have urged portions of cross-examination be read back is refuted by the record. The cross-examination of Mr. Rosen was unrelated to the jury request. It merely confirmed the positiveness of Mr. Rosen's identification of appellant as the person who had robbed him.

defense counsel, failed to comply with the statute. The question is whether that failure was prejudicial or harmless.

As our Supreme Court observed: "The standard of review in assessing the impact of an improper communication between the court and a deliberating jury is not clear." (*People* v. *Hawthorne* (1992) 4 Cal.4th 43, 68, fn. 14 [14 Cal.Rptr.2d 133, 841 P.2d 118].) Because *Hawthorne* declined to resolve the issue we apply the more onerous review standard: whether the error was harmless beyond a reasonable doubt. (*Ibid.*) We are satisfied the error was harmless.

The trial court's response to Juror Gordon's question was balanced, neutral, and correct. It referred the juror to the appropriate CALJIC instruction (CALJIC No. 2.21.1) which addressed discrepancies in testimony. The answer also correctly synopsized the instruction by noting that whether a discrepancy is important or trivial is something to be considered. Finally, the trial court's response correctly told the jury that "It's up to you to make those decisions."

Defense counsel, at subsequent trial court proceedings, did not object to the trial court's response and appellate counsel does not fault the response. Rather, appellate counsel speculates about what the trial court did *not* say: "Had trial counsel been present to discuss the response to be given, instructions focusing the jury's attention upon the issue of identification and the prosecution's burden to prove appellant's guilt beyond a reasonable doubt could have been offered."

Appellant mistakes the function of the trial court. Its function is to provide the jury with applicable law (CALJIC No. 17.31), not to intimate what the facts are (CALJIC No. 17.30), nor suggest what instructions deserve "jury focus" (CALJIC No. 17.31).

The trial court fully and correctly instructed the jury, including instructions concerning reasonable doubt[5] (CALJIC No. 2.90), eyewitness identification (CALJIC Nos. 2.91, 2.92), and discrepancies in testimony (CALJIC No. 2.21.1 (mod.)).

We hold that the trial court's error in answering the juror's question in the absence of defense counsel was harmless beyond a reasonable doubt. (See

---

[5] As Justice Johnson wisely observed for this unanimous court, " 'Well intentioned efforts to "clarify" and "explain" these [reasonable doubt] criteria have had the result of creating confusion and uncertainty, and have repeatedly been struck down by the courts of review of this state.' " (*People* v. *Rubalcava* (1988) 200 Cal.App.3d 295, 300 [246 Cal.Rptr. 75], quoting *People* v. *Garcia* (1975) 54 Cal.App.3d 61, 63 [126 Cal.Rptr. 275].)

*People* v. *Jennings* (1991) 53 Cal.3d 334 [279 Cal.Rptr. 780, 807 P.2d 1009] [trial court, ex parte, explained hung jury procedure to the jury; error not prejudicial]; *People* v. *Conrad* (1973) 31 Cal.App.3d 308 [107 Cal.Rptr. 421] [prosecutor's opening statement read to new juror in defendant's absence; error not prejudicial]; *People* v. *Stewart* (1983) 145 Cal.App.3d 967 [193 Cal.Rptr. 799] [jury requests specified instructions be reread slowly; trial court, without notice to counsel, sends all instructions, replete with cross-outs, into jury room; error not prejudicial]; *People* v. *Bloyd* (1987) 43 Cal.3d 333 [233 Cal.Rptr. 368, 729 P.2d 802] [both counsel, but not defendant, stipulate court reporter may read defendant's testimony to jury in jury room; error not prejudicial]; *People* v. *Brew* (1984) 161 Cal.App.3d 1102 [208 Cal.Rptr. 11] [during deliberations the jury requested that certain testimony be read to them; the trial court, without notice to counsel or to the defendant, had the testimony read; error not prejudicial]; *People* v. *Hovey* (1988) 44 Cal.3d 543 [244 Cal.Rptr. 121, 749 P.2d 776] [requested testimony read to jury in counsel's presence but defendant's absence; error not prejudicial]; *People* v. *Lang* (1989) 49 Cal.3d 991 [264 Cal.Rptr. 386, 782 P.2d 627] [counsel stipulated that requested testimony (including defendant's) could be read to jury in their absence; no personal waiver from defendant; error not prejudicial]; *People* v. *Douglas* (1990) 50 Cal.3d 468 [268 Cal.Rptr. 126, 788 P.2d 640] [requested testimony read to jury in counsel's presence but defendant's absence; error not prejudicial].)

## 2. *Jury coercion*

On the morning of March 18, after slightly more than one day of deliberation, the jury sent a note to the trial court indicating it was hung. The note also disclosed that 5 votes had been taken with the numerical count changing from 6-3-3 to 10-1-1 to 11-1. The note further disclosed, in violation of the trial court's instruction,[6] that the 11-to-1 vote favored guilt.

The trial court, in the presence of appellant and counsel, questioned the foreperson about the five jury votes and their numerical division. The trial court made clear it did not want the foreperson to disclose whether the division favored guilty or not guilty and no such oral disclosure was made. Immediately after the foreperson reported the 11-to-1 vote the trial court stated, "The jury will retire and resume their deliberations." That afternoon the jury returned their guilty verdict.

██ Appellant contends the trial court coerced the jury's verdict by having them resume deliberations after he learned their last 11-to-1 vote favored guilt. Appellant is mistaken.

---

[6]The trial court stated, "I'm not going to read the communication because it sets forth the jury division, which it should not. As I indicated in my instructions, you are not to communicate, until specifically directed to do so, how you are divided on any issue. Not even to me."

First, by failing to object, promptly or at all, appellant waived any error. (Evid. Code, § 353; see *People* v. *Saunders* (1993) 5 Cal.4th 580, 589-591 [20 Cal.Rptr.2d 638, 853 P.2d 1093].)

Second, there was no coercion. "The applicable legal principles are well established. Under section 1140, the trial court is precluded from discharging the jury without reaching a verdict unless both parties consent or 'unless, at the expiration of such time as the court may deem proper, it satisfactorily appears that there is no reasonable probability that the jury can agree.' We have explained that '[t]he determination whether there is reasonable probability of agreement rests in the sound discretion of the trial court. [Citation.] The court must exercise its power, however, without coercion of the jury, so as to avoid displacing the jury's independent judgment "in favor of considerations of compromise and expediency." [Citation.]' . . . [¶] No improper coercion occurred here. The trial court made no coercive remarks and exerted no undue pressure on the minority juror to change his vote." (*People* v. *Sheldon* (1989) 48 Cal.3d 935, 959 [258 Cal.Rptr. 242, 771 P.2d 1330] internal citations omitted [during penalty phase jury informed the trial court it was deadlocked in favor of death 11-1; no error in having jury resume deliberations and arrive at verdict of death]; see also *United States* v. *Akbar* (9th Cir. 1983) 698 F.2d 378.)

## DISPOSITION

As respondent correctly notes appellant has been credited with one more custody day credit than he was entitled to. Accordingly, the abstract of judgment is ordered modified by correcting "268" days' total custody to 267, and "89" good time days to 88. As modified, the judgment is affirmed.

Lillie, P. J., concurred.

**JOHNSON, J.**—I respectfully dissent.

My colleagues and I agree the trial court committed both constitutional and statutory error when it entertained a juror's question on the law and evidence in the case in the absence of defense counsel. We part company only on whether that clear constitutional and statutory error requires a retrial. By downplaying evidentiary discrepancies on the key factual issue in the case and ignoring controlling precedent, the majority manages to conclude this error was harmless. I am unable to do so.

Identity of appellant as one of the robbers was the primary issue in the case. However, the witnesses' testimony regarding whether appellant was

the assailant was contradictory. Indeed, it was the testimony of one of the victims who testified appellant was not his assailant the jury requested for readback. The number of split votes in ballots taken over two days of deliberations on the single count of robbery underscores the fact this case was anything but open and shut. Nevertheless, the majority glosses over the probable prejudicial impact of the court's error in communicating with the deliberating jury in the absence of defense counsel in what was already a close case on the issue of identity. The majority simply concludes the error was not prejudicial, and makes no attempt to analyze the effect the trial court's error had on the verdict.

Moreover, and equally disturbing, the majority does not cite or even acknowledge controlling precedent before concluding the error in this case was harmless. The cases the majority relies on (see maj. opn., *ante*, at p. 253) bear no factual similarity to the case at bar. With the exception of *People* v. *Jennings* (1991) 53 Cal.3d 334 [279 Cal.Rptr. 780, 807 P.2d 1009], none of the cases the majority cites in finding the error harmless, involved, as does this case, a trial court entertaining a juror's question on the law and evidence applicable to the case in the absence of counsel. Consequently, these decisions provide no authority for finding the error harmless in this case. In *Jennings* the trial court's error in communicating with the deliberating jury was deemed nonprejudicial, because there the court immediately notified counsel of its error and gave counsel the opportunity to suggest further instruction or clarification. The trial court in this case, by contrast, did not notify counsel of its error, promptly or otherwise, and consequently counsel had no opportunity to neutralize the prejudicial effect on the jury of the court's improper communication.

Because this case was very close on the key issue of identity, and because counsel's input regarding the effect of discrepancies in the witnesses' testimony would likely have made a difference, I cannot find the error to be harmless beyond a reasonable doubt. Accordingly, I would find the error prejudicial and reverse the judgment on this ground alone.

DISCUSSION

I. *Appellant's Right to Counsel at a Critical Stage of a Criminal Trial Was Violated.*

The jury requested certain testimony be read back during deliberations. The trial court notified defense counsel by phone who agreed to "simply send the reporter into the jury room to read the testimony that the jury has requested" without his presence. However, the court then brought the jury

into the courtroom and orally questioned the jury regarding the specific sections of testimony requested to be read back. During this same meeting one of the jurors stated, "Well, I had the question about Mr. Tyler's testimony, but also I wanted to know in the legal way that discrepancies in the testimony, is that enough cause for a reasonable doubt?" The court responded, "That's something for the juror to decide. . . . I can only refer you to the instruction that deals with discrepancies between one witness' testimony and another. It outlines it's something to be considered, whether it's a fact of importance or a trivial detail, that you have to consider. It's up to you to make those decisions." The court then directed the jury to CALJIC No. 2.21.1 regarding discrepancies in testimony.

As the majority acknowledges, there is nothing to suggest defense counsel's particularized waiver to be present at the readback of testimony to the jury in the deliberation room encompassed the right to be present to answer jury questions or for further substantive instructions from the court. According to the trial court's description, defense counsel only waived his right to be present at the readback of testimony to the jury in the deliberation room.

A defendant "is entitled to the assistance of counsel at all critical stages of the proceedings under the Sixth Amendment of the United States Constitution." (*People* v. *Stewart* (1983) 145 Cal.App.3d 967, 972 [193 Cal.Rptr. 799].) Moreover, a defendant is afforded additional protection under Penal Code section 1138 which provides: "After the jury have retired for deliberation, if there be any disagreement between them as to the testimony, or if they desire to be informed on any point of law arising in the case, they must require the officer to conduct them into court. Upon being brought into court, the information required must be given in the presence of, or after notice to, the prosecuting attorney, and the defendant or his counsel, or after they have been called."

Communications between a jury and the court regarding clarification of facts or law dealing with the case represent a critical stage of the trial. (*People* v. *Hawthorne* (1992) 4 Cal.4th 43, 69 [14 Cal.Rptr.2d 133, 841 P.2d 118]; see also *People* v. *Dagnino* (1978) 80 Cal.App.3d 981, 988 [146 Cal.Rptr. 129].) Therefore, a statutory and constitutional violation of the right to counsel occurs "where the court actually provides the jury with instructions or evidence during deliberations without first consulting counsel." (*People* v. *Mickle* (1991) 54 Cal.3d 140, 174 [284 Cal.Rptr. 511, 814 P.2d 290].)

I therefore agree with the majority the trial court erred in answering the juror's question and in providing additional jury instructions without first contacting counsel.

II. *Appellant's Denial of Counsel When the Court Answered a Juror's Question and Provided Supplemental Jury Instructions Was Not Harmless Beyond a Reasonable Doubt.*

" 'While denial of counsel at the critical stage of a criminal proceedings is not prejudicial as a matter of law, prejudice will be presumed if the denial may have affected the substantial rights of the accused. Only the most compelling showing to the contrary will overcome the presumption. The court must be able to declare a belief the denial of counsel was harmless beyond a reasonable doubt.' . . ." (*People* v. *Jennings, supra,* 53 Cal.3d 334, 384, citations omitted.)

In *People* v. *Hawthorne, supra,* 4 Cal.4th 43, 68-69, the court reviewed several cases to distinguish when a court's improper communication with a deliberating jury constitutes prejudicial error and when such error may be deemed harmless.

The *Hawthorne* court analyzed cases where the improper communication affected the substantial rights of the defendant and was therefore prejudicial error. For instance, in *People* v. *Weatherford* (1945) 27 Cal.2d 401, 418 [164 P.2d 753], the trial court, through the bailiff and in the absence of defendant's attorney, responded to a juror inquiry " '[w]hether or not it was the duty of the prosecution or the defense to put the defendant on the scene.' " (*Id.* at p. 417.) The court's reply, as well as the bailiff's additional colloquy with the jury, was apparently "interpreted as meaning that the matter was none of the jury's business." (*Id.* at p. 419.) This ex parte communication concerning the prosecution's burden of proof and the evidence constituted reversible error.

In *People* v. *Lozano* (1987) 192 Cal.App.3d 618, 625 [237 Cal.Rptr. 612], in response to the jury's question during deliberations ". . . the trial judge gave a self-defense instruction without notifying defense counsel or otherwise affording him an opportunity to object to the instruction before it was given." (*Id.* at p. 622.) Again, the court found the error in instructing in counsel's absence prejudicial.

Similarly, in *People* v. *Dagnino, supra,* 80 Cal.App.3d 981 the court gave the jury additional instructions on the difference between first and second degree burglary and the definition of accessory and also provided them with a written copy of all instructions without informing counsel or permitting any response. (*Id.* at pp. 985-986.) Based on the lack of input from counsel regarding the law applicable to the case, this error was also found prejudicial.

Our high court distinguished these cases by noting "[i]n each circumstance, counsel could have taken some action on the defendant's behalf to amplify, clarify, or modify the supplemental instruction or procedure." (*People* v. *Hawthorne, supra,* 4 Cal.4th at pp. 68-69.) The trial courts' failure in these cases to give notice to counsel or afford an opportunity to respond thus constituted statutory as well as constitutional error. " 'Penal Code section 1138 requires that any questions posed by the jury regarding the law or the evidence be answered in open court in the presence of the accused and his or her counsel, unless presence is waived. Communication between judge and jury during deliberations without affording defendant and counsel an opportunity to be present impinges on a defendant's constitutional right to the assistance of counsel.' " (*People* v. *Hawthorne, supra,* 4 Cal.4th at p. 69, citing *People* v. *Chagolla* (1983) 144 Cal.App.3d 422, 432 [193 Cal.Rptr. 711].)

The court in *People* v. *Hawthorne, supra,* 4 Cal.4th at page 69 distinguished the foregoing cases from the one before it. In *Hawthorne* the ex parte communication did not direct the jury on any question "regarding the law or the evidence." For that reason the court would not "infer from either the fact of the communication or the absence of a contemporaneous verbatim record that a prejudicial contact occurred." (*Ibid.*) From the totality of the circumstances presented in that case the court concluded the defendant had not suffered "an impairment of rights sufficient to affect the verdict." (*Ibid.*)

In *Hawthorne,* during deliberations the jury sent the bailiff a note asking "What do we do now? After much extra deliberation one member of the jury is not sure the defendant is guilty or not guilty." Since the trial judge was on vacation, he directed the bailiff to have the jury maintain the status quo pending notification of counsel and their agreement to any further instructions. The court found once the jury expressed a desire and intent to continue deliberating without a reply, the court had only one reasonable response: "Keep deliberating."

The court found these circumstances more closely paralleled those found nonprejudicial in *People* v. *Alcalde* (1944) 24 Cal.2d 177 [148 P.2d 627]. In *Alcalde,* the jury sent the court a note inquiring, " 'May we render a decision of life imprisonment and not eligible for parole?' . . . ." The court responded, " 'No.' " The defendant claimed reversible error "because of this communication between the judge and jury out of the presence of the defendant and his counsel." (*Id.* at pp. 188-189, italics omitted.) Since the court could not have responded by any other answer than "No" or its equivalent, and since the answer of the trial judge could properly have been made over the objection of the defendant if the ordinary procedure had been followed, the communication was not deemed prejudicial. (*Ibid.*)

The facts of the case before this court are indistinguishable from the cases the *Hawthorne* court acknowledged constituted prejudicial error. It is only by ignoring the subject matter of the trial court's discussion with the deliberating jury the majority can conclude otherwise. Here, the trial judge entertained a juror's question on the law and evidence in the case in the absence of counsel. Next, the trial judge answered the question and provided an additional jury instruction, again without defense counsel being present. The court did not notify counsel of these events, who therefore could not object or offer any suggestions.[1]

Unlike the situations in *Hawthorne* and *Alcalde,* the trial court's response to the juror's question was not the only possible or correct response. Had counsel been present at the time the juror asked his question, counsel could have taken some action on appellant's behalf to amplify or clarify the juror's question. The juror's question is not crystal clear and may be interpreted a number of ways. On appeal, appellant suggests a reasonable interpretation of the question is whether discrepancies in the testimony are enough to create a reasonable doubt to find the defendant not guilty. If this was the import of the juror's question, counsel could have, for example, asked for a special instruction relating conflicting testimony to a reasonable doubt of guilt. (See, e.g., *People* v. *Sears* (1970) 2 Cal.3d 180, 189 [84 Cal.Rptr. 711, 465 P.2d 847].) Since we now know that at the time of the inquiry the jury balloting started at 6-3-3 and later moved to 10-1-1, this appears to be a plausible interpretation of what was bothering the jurors and the corrective action defense counsel could have requested if given the opportunity.

Furthermore, if given the chance, counsel could have requested a modification of the instruction the court did give, or request reinstruction on the definition of reasonable doubt (CALJIC Nos. 2.91, and 2.92) and the prosecution's burden of proof (CALJIC No. 2.90). Because any of these efforts could have proved beneficial to appellant, counsel's absence at the time of the court's improper communication with the jury affected his substantial rights.

Because counsel could have taken some action to modify or clarify the instruction the court did give, the majority's argument the instruction was correct in law and not inherently improper simply misses the mark. Defense counsel's duty to protect and advance the interests of his or her client is not limited to ensuring the jury is not given wholly erroneous instructions.

---

[1]In contrast to the situation in *People* v. *Jennings, supra,* 53 Cal.3d 334, 384, the trial court apparently did not give counsel notice, prompt or otherwise, of its "misstep" in communicating with the jury in the absence of counsel. Consequently, unlike *Jennings* the trial court did not give counsel the opportunity to object to the court's communication or to suggest possible corrective measures.

According to *People* v. *Hawthorne, supra,* 4 Cal.4th at page 68, footnote 14, the standard of review in assessing the impact of an improper communication between the court and a deliberating jury is not settled. In that case the court noted both the "miscarriage of justice" standard (*People* v. *Weatherford, supra,* 27 Cal.2d at p. 418) and the "harmless beyond a reasonable doubt" test (*Chapman* v. *California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824] (*Chapman*)) have been invoked in past cases (*People* v. *Jennings, supra,* 53 Cal.3d 334; *People* v. *Hogan* (1982) 31 Cal.3d 815 [183 Cal.Rptr. 817, 647 P.2d 93]). The *Hawthorne* court did not resolve the issue since prejudice was not found under either standard in that case.

More recent decisions have employed the *Chapman* standard of review of constitutional error in this context. Our decision in *People* v. *Rubalcava* (1988) 200 Cal.App.3d 295 [246 Cal.Rptr. 75], is one such example. In that case, the defense stipulated the trial court could answer only those jury questions which did not require discussion or research. However, the court defined the concept of moral certainty for the jury without counsel or defendant being present. In using the *Chapman* test, we stated from our reading of the record we could not say this error was harmless beyond a reasonable doubt. "Because defense counsel was not present when the trial court extemporaneously responded to the jury's question about the meaning of moral certainty, we can only conjecture about what appellant's lawyer could have done had he been present." (*Id.* at p. 301, italics omitted.) Nonetheless, we believed a reasonable attorney would have objected to any "clarification" of reasonable doubt. (*Ibid.*)

The facts of this case closely resemble those of *People* v. *Rubalcava.* Since defense counsel was not present at the time the juror asked the question and the trial judge provided additional instructions, I can only conjecture as to the actions defense counsel actually would have taken. At a minimum, a reasonable attorney would have had the juror clarify the question regarding reasonable doubt and asked for instructions that were most favorable to appellant.

Similar to *People* v. *Rubalcava,* evidence of guilt in this case was far from overwhelming. The single most critical issue at trial was the identity of the person who robbed Robert Rosen. However, the testimony revealed serious discrepancies in the witnesses' identification of appellant as the assailant. In finding the error harmless the majority chooses to minimize this vital evidence.

Robert Burns, a witness who heard the altercation and called 911, saw two men step into his line of vision when he yelled at them to stop fighting. One

man was a large Black male who wore a turban. The other man was tall, wore Levi shorts, white shirt and had his long blond hair in a ponytail. Burns described this man as having a fu manchu type moustache which was so long it hung below the man's chin.

Rosen, the robbery victim, described his assailant as tall, wearing a white blousey shirt and white trousers, six feet four inches tall, over two hundred pounds and long blond hair. Rosen did not recall seeing any facial hair.

Rosen testified he saw appellant several times both before and after the incident. Every time he saw appellant—significantly, with the exception of the night he was robbed—Rosen testified appellant was with his transvestite companion.

A few days after the incident in this case Rosen witnessed another robbery. Rosen testified he was "absolutely certain" the robber was appellant. However, the victim of the second robbery, Edmund Tyler, testified he did not think appellant was the one who robbed him. After being knocked down, Tyler stared directly at his assailant's face. Tyler described the physical characteristics which distinguished his assailant from appellant: His assailant had a very chiseled face, perhaps Polish or Hungarian, with much more pronounced cheekbones than appellant's. In addition, Tyler's assailant had far more of a receding hairline than appellant. Based on these differences Tyler did not think appellant was the person who had robbed him.

Apparently, the jury likewise considered this case to be close since it deliberated for almost two days on a single count before rendering a guilty verdict. Prior to the communication between the court and jury, the jury balloting had been 6-3-3 and 10-1-1 in favor of guilt. After the court's discussion with the jury the balloting was 11-1 and the jury informed the court it had reached an impasse. The court then ordered the jury to resume deliberations and they returned two hours later with a guilty verdict.

On this record, I cannot conclude the error in denying defendant his right to counsel at the critical stage when the trial court was answering a juror's question and providing supplemental jury instructions can be deemed harmless beyond a reasonable doubt. Accordingly, I would reverse the judgment.

Appellant's petition for review by the Supreme Court was denied March 2, 1995. Mosk, J., was of the opinion that the petition should be granted.