Filed 2/20/15  P. v. McClane CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E055088 |
| v. | (Super.Ct.No. FWV900584) |
| MATTHEW JAMES MCCLANE, et al., | ORDER MODIFYING OPINION |
| Defendants and Appellants. | [NO CHANGE IN JUDGMENT] |

The opinion filed in this matter on January 21, 2015, is hereby modified, as follows:

On page 26, footnote number 24 is modified as follows:  Every bracketed answer with the name [SHYNE] is replaced with [SHYNE'S FRIEND].

1

Except for this modification, the opinion remains unchanged. This modification does not change the judgment.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ _____
P. J.

I concur:

CODRINGTON _____
J.

2

Filed 1/21/15  P. v. McClane CA4/2 (unmodified version)

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E055088 |
| v. | (Super.Ct.No. FWV900584) |
| MATTHEW JAMES MCCLANE, et al., | OPINION |
| Defendants and Appellants. | |

APPEAL from the Superior Court of San Bernardino County.  Stephan G. Saleson, Judge.  Affirmed in part; reversed in part with directions.

Patricia A. Scott, under appointment by the Court of Appeal, for Defendant and Appellant Matthew James McClane.

Roger S. Hanson for Defendant and Appellant Larry Darnell Shyne.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina and Kelley A. Johnson, Deputy Attorneys General, for Plaintiff and Respondent.

1

A jury convicted Matthew McClane and Larry Shyne of first degree felony murder (Pen. Code, § 187, subd. (a)),[1] first degree burglary in the presence of another person (§§ 459, 667.5, subd. (c)) and attempted first degree robbery in concert (§§ 211, 213, subd. (a)(1)(A)).  The jury found that all three crimes had been committed for the benefit of, at the direction of or in association with a criminal street gang (§ 186.22, subd. (b)(1)(c)), that a principal had used a handgun, (§ 12022.53, subds. (b) & (e)(1)), that a principal discharged a handgun (§ 12022.53, subds. (c) & (e)(1)), and that a principal discharged a handgun causing death (§ 12022.53, subds. (d) & (e)(1)).  As to McClane, the jury also found that he personally used a firearm (§ 12022.53, subd. (b)), discharged a firearm (§ 12022.53, subd. (c)) and discharged a firearm causing death (§ 12022.53, subd. (d)) as to each offense.  In bifurcated proceedings, the trial court found that McClane had suffered three prior convictions for which he served prison terms.  McClane was sentenced to prison for three 25 years to life terms, plus 11 years, 6 months.  Shyne was sentenced to prison for two 25 years to life terms, plus 17 years, four months.  Defendants appeal, making various contentions, all of which we reject, with the exception of McClane's arguments about the applicability of section 654 to his sentence.  We therefore affirm the convictions, while reversing some of the terms imposed for some of the convictions and true findings and we direct the trial court to correct the minutes of the sentencing hearings and abstracts of judgment to reflect these changes, and to omit

_____

[1]  All further statutory references are to the Penal Code unless otherwise indicated.

references in McClane's abstract of judgment and minutes to one of his prison priors. We also direct the trial court to pronounce sentence on the gang enhancement attached to Shyne's murder conviction, which the court failed to do at sentencing.[2]

## FACTS

Shyne's cousin testified and/or told the police[3] that he and fellow 87th Street gang member, McClane, were always together and at the time of the crimes, were living around the corner from each other in Pomona. He did not know the victim. Shyne had seen his cousin and McClane together "a lot."

On December 19, 2008, Shyne called his cousin at their grandmother's home and said he wanted the cousin and McClane to do a robbery that day. Shyne said that he had been to the victim's motel suite the day before and she had been getting money from prostituting herself. Shyne explained that his cousin doing the robbery would be good because the latter had just gotten out of prison and had no money for Christmas gifts.[4]

---

[2] We note that the minutes of the sentencing hearing state that the sentencing court imposed "the middle term of 15 years" for the gang allegation as to the murder, which the court then stayed pursuant to section 654. The latter is repeated in the abstract of judgment, absent the reference to section 654. However, the sentencing court's oral pronouncement contains no reference to 15 years, to a stay or to section 654.

[3] Citations to Exhibit 178 herein are to the cousin's interview with police, so that the reader may see the consistencies between that statement and the cousin's trial testimony.

[4] Shyne had also just gotten out of prison, but he did not need money and had several cars.

Shyne told his cousin that the victim put money in an unlocked safe all the time. The safe was behind the picture in the bedroom, over the bed, in her motel suite. During his interview with police, Shyne's cousin lied and said it wasn't Shyne, but one of Shyne's pimp partners, who had put the cousin up to the robbery, because he wanted to protect Shyne, who was family.[5] Shyne wanted his cousin to call the cousin's friend, McClane, and Shyne asked where the latter was. Either Shyne's cousin called McClane and ran the plan for the robbery by him and McClane agreed to it, or the cousin called McClane and told him that Shyne had something for him and he should call Shyne. Shyne had seen McClane's facial tattoos when he would see his cousin and McClane together before the crimes. Shyne picked his cousin up, then telephoned the victim, called her a punk and she hung up on him. Shyne then picked McClane up at McClane's house at 5:00 or 6:00 p.m. and drove his cousin and McClane to the victim's motel in his Cadillac, although the cousin had lied to the police and said it was a Corolla. McClane was "amped up." Shyne told them that the victim, who was a prostitute, had a number of valuables in her motel suite that she had purchased as Christmas presents and he wanted her laptop computer, but McClane and Shyne's cousin could have any jewelry and money she had. Shyne told them the victim's suite number.[6] The cousin and McClane were told that there were

---

[5] Indeed, during his lengthy interview with the police, the cousin spent hours trying to cover for Shyne, before finally admitting the latter's involvement.

[6] In his statement to the police, he said that the victim gave McClane her suite number during one of their pre-pick up calls.

thousands of dollars in the victim's motel suite.  Shyne told them that the victim was a punk and they were to "rough her up" a bit and she would give them what they wanted. Shyne's cousin assumed that the victim kept track of her customers on her laptop and that Shyne wanted it so he could give their contact information to the prostitutes who were working for him at the time.  Although Shyne was not then working, he was making money off the prostitutes for whom he pimped.  Shyne instructed his cousin and McClane to call the victim and say that they had seen her ad on Craigslist and ask her if she "does Greek."[7]  McClane called the victim, using the phone number either Shyne had given him or which was in the victim's Craigslist ad, to which Shyne had directed him.  He spoke to her via speakerphone in the presence of Shyne's cousin and Shyne, asking her if she "did Greek" and how much it would cost for the whole night.  The victim set up several times for the two to meet at the motel, saying she had customers.  After about four calls from McClane, a time was finally set.  The victim said she was ready and the three went to the motel and Shyne parked his car on the street next to it.  Shyne had shown his cousin and McClane earlier the best way to get in and out of the motel and he said that he would drive around while they were inside and pick them up when they came out.  Shyne did not go in because the victim knew him.  Shyne dropped his cousin and McClane off out of the sight of the motel's surveillance cameras and took off.  Shyne's cousin and McClane entered the front doors of the motel, saw no one at the front desk and went to

---

[7]  This is a reference to anal intercourse.

the elevators, where they put on gloves because they were both on parole and didn't want their fingerprints left in the suite in case the victim called the police. After they checked the exit door Shyne had previously told them to use, they went to the victim's suite. McClane told Shyne's cousin to go in first because he did not have tattoos on his face like McClane did.

The victim, who was naked under her opened robe, opened the door just as Shyne's cousin was about to knock. The victim told the cousin that she heard him and McClane coming. Shyne's cousin believed that the room safe had been left open, so his objective was to find it. He walked past the victim and into the bedroom of the suite to find the safe, and while there, he heard McClane with the victim on the living room couch, saying to the victim, "Shut up," "bitches" and "Where's the money?" He also heard the sound of McClane slapping the victim. Shyne's cousin checked behind the picture in the bedroom,[8] but there was no safe. The cousin lifted up the mattress on one side, unsuccessfully looking for money or valuables. He found nothing worth taking and no safe. He did not see a laptop, although there was one in the living room. The cousin was supposed to serve as a lookout, so he proceeded to the front door of the suite.[9] Although he gave conflicting accounts of this, he said he saw McClane dump out the

---

[8] The case agent and a forensic specialist, both of whom examined the scene after the crimes, testified that there was no picture in the bedroom. The jury was shown pictures of the bedroom.

[9] He gave conflicting accounts of how open the door to the victim's suite was at the time.

6

victim's purse on the couch. He heard the victim say, "What money? What are you talking about?" to McClane. McClane hit the victim again and repeated his question about where the money was. The victim repeated what she had said before, getting louder. McClane told her to shut up, she got quiet, then he asked her again where the money was and she said, loudly, "What money? What are you talking about?" McClane angrily told the victim to shut up, pulled out a chrome handgun, which Shyne's cousin had not known McClane had, and fired without aiming. The victim said, "What the fuck?" and the cousin and McClane fled the suite. They had been there for less than two minutes. Neither McClane nor Shyne's cousin took anything from the suite. The cousin asked McClane why he had shot the victim and McClane said it was an accident. They went out of the motel as Shyne had instructed them. Shyne's cousin gave conflicting accounts of what became of the gun. Following Shyne's direction, McClane tried to call Shyne on his cell phone, but was not able to reach him. As McClane hung up the phone, Shyne pulled up in his car and picked them up.

Just after the cousin and McClane got into Shyne's car, and in response to his inquiry, Shyne was told that the victim had been shot and, the cousin told him that he did not see a laptop. Shyne told them that they should have taken the victim's cell phone, which the cousin assumed was because it contained the phone numbers of her customers. Shyne was upset that McClane had shot the victim and was even more upset when he learned that she had died. Shyne dropped McClane off at McClane's home, and McClane left the jacket he had been wearing in Shyne's car, telling Shyne and the cousin to throw

7

it away.[10]  Shyne then drove to his home in San Bernardino, where his cousin threw McClane's jacket and the clothes he had been wearing in Shyne's neighbor's trash cans, and, at Shyne's suggestion, he and Shyne wiped down Shyne's car.  All three later agreed to keep quiet about the crimes.  About a week after the crimes, Shyne told his cousin that the victim was his prostitute, but she had no pimp.[11]  Members of Shyne's family visited the cousin frequently while the later was in jail awaiting trial in this case.  They put money on his commissary account at the jail.  He finally wrote them and told them to stop visiting him and stop putting money on his account because it looked like they were trying to bribe him.  Shyne's father told the cousin that when it comes to family, the cousin was to shut up, but everyone else could be ratted out.

Although at the time of the crimes Shyne's cousin did not know if Shyne was the victim's pimp, afterward, he felt that he had been bamboozled by Shyne—that Shyne was trying to scare the victim into coming back to him as her pimp.

---

[10]  The cousin gave a conflicting account of this at the preliminary hearing, testifying that McClane threw away his own jacket.

[11]  The cousin gave conflicting accounts of how he learned that Shyne had pimped for the victim.

1. *Admission of Evidence*

    a. *Statement by the Victim to Her Friend and Sometime Housemate*

As is pertinent to this issue, the victim's friend and sometime housemate (hereinafter, "the victim's friend") testified that on one occasion,[12] when the victim was staying at another motel, while also sharing the friend's home with him, she called the friend and said that she was very upset. Admitted solely for the purpose of explaining why the friend went to that motel, the friend testified that the victim told him that she was having trouble with a man having Shyne's nickname, whom the friend identified in court as Shyne. The friend went to that motel with a hammer in the company of his brother. When he arrived, he saw the victim, who was standing at the door of one of the rooms with a black eye and a bloody mouth. She was upset and crying. Shyne, whom the friend testified was a pimp at the time, was standing near his car. The friend asked the victim what was wrong. Without objection by either defense counsel, the friend testified that the victim started to say something about Shyne hitting her. The friend approached Shyne and Shyne pulled a gun out of his waistband and held it at his side and the friend pulled out the hammer he had brought. Shyne ran around the back of his car, said, "This bitch owes me money[,]" and threw the gun through the open window of his car onto the back seat. The friend asked what this was about and Shyne said that the victim owed him $800 due to a bet. The friend asked Shyne what the bet was about, Shyne told him and

---

[12] The friend testified that he met the victim in 2007 or 2008, so this incident would have had to have occurred after this.

9

the friend said that the bet was stupid.  The friend and Shyne discussed it and the friend gave Shyne $200 to settle the matter.  Shyne said that he was going to get paid one way or another and the friend could not protect the victim forever.  Shyne said that the victim was one of "his bitches" and he told the victim that the friend could not protect the victim forever and he had people from Pomona that had the ability to "reach out and touch" the victim and when he was ready, he would "get her" without lifting a hand.  Shyne threatened to kill the victim, who was very scared.  The defendants, here, for the first time, assert that the victim's statement to her friend that Shyne has hit her should not have been admitted because it violated their right to confrontation.  They assert, "other than [Shyne's] statement [to the victim], no evidence establishes who, if anyone, hit [the victim]."

First, defendants here cannot contest the admission of this statement because both failed to object to it below on any basis.  (*People v. Maciel* (2013) 57 Cal.4th 482, 531 (*Maciel*).)  Defendants appear to attempt to bypass this rule by arguing that because the statement violated their confrontation rights, it cannot serve as corroboration of the cousin's account of the crimes.  However, either the statement was properly admitted or it was not.  If it was, it can serve any purpose to which the jury chose to employ it.  If it was improperly admitted because it was unsuccessfully objected to on a basis which this court now recognizes as meritorious, then defendants may assert that it should not have served as corroboration of the cousin's account.  However, the latter did not occur, therefore, their argument is meritless.  Second, since the statement was made by the victim under

10

the stress of her having been attacked and injured, even if either defendant had objected

below, the prosecution may well have been able to have the statement admitted as an

excited utterance, which would bring it outside the ambit of *Crawford v. Washington*

(2004) 541 U.S. 36.  (*Crawford* at p. 58, fn. 8; *People v. Rincon* (2005) 129 Cal.App.4th

738, 757.)  More importantly, because the statement was not made during a conversation

involving an agent of the police, it was not testimonial.  (*People v. Hajek and Vo* (2014)

58 Cal.4th 1144, 1203; *Maciel, supra,* 57 Cal.4th at p. 531; *People v. Lopez* (2013) 56

Cal.4th 1028, 1065, 1066 (*Lopez*).)[13]  Third, even if the statement was erroneously

admitted, neither defendant was prejudiced by it in the way defendants now claim they

were.  This is because the friend's testimony, *minus the contested statement*, created a

reasonable inference that it was, indeed, Shyne who had hit the victim.  Finally, the

statement was no more prejudicial than the facts that Shyne was in the presence of the

injured victim, with whom he had a relationship, and was doing nothing to help her, but,

---

[13]  Remarkably, appellate counsel for Shyne, in his reply brief, concedes this.  It would have been best for appellate counsel to discover this long before he authored his opening brief.  Still, he argues that the victim's friend's testimony cannot corroborate Shyne's cousin's account of the crimes, thus converting his original admission of the evidence issue into a sufficiency of the evidence issue.  First, he erroneously asserts that the incident between the victim's friend and Shyne occurred well over a year before the crimes.  The record does not support this assertion.  The victim's friend testified only that he met the victim in 2007 or 2008 (see fn. 12, *ante*, p. 10) and the crimes occurred in December, 2008.  Second, his assertion that the testimony of the victim's friend could not possibly corroborate Shyne's cousin's account of the crimes takes a far too narrow view of what constitutes corroboration, as we discuss, below.  The facts testified to by the victim's friend suggest that Shyne was involved in the crimes, which corroborates the cousin's account.

11

instead, was accusing her of owing him money and calling her a derogatory name, he pulled a gun on the victim's friend who was there to assist the victim, and he threatened the victim's life, even though her friend, armed with a hammer, and his brother were present. These facts were just as prejudicial, if not more so, than the statement that it was Shyne who had hit the victim.

b. *The Victim's Statement to the Innkeeper*

As is pertinent to this issue, the innkeeper at the motel where the victim was killed testified that about a week before the crimes, a female friend of the victim's with the nickname "Diamond" came to the front desk and asked the innkeeper if the latter could call the victim or see if the victim was in her suite. The innkeeper knew that the victim was there because the victim had previously called down to the front desk and told the innkeeper that her friend Diamond was looking for her, but the innkeeper should not tell Diamond that the victim was in her suite. After the innkeeper was asked what the victim had said about Diamond's boyfriend, and the innkeeper replied that the victim had said that the boyfriend was a mean guy,[14] Shyne's trial counsel objected on the basis that the statement was hearsay. The prosecutor asserted that the statement was not being admitted to prove the truth of the matter asserted therein, but for the non-hearsay purpose of showing why the innkeeper took the actions she did with Diamond, i.e. not telling her that the victim was in her suite. The trial court agreed, and instructed the jury that the

[14] The innkeeper later added that the victim had said that Diamond's boyfriend was also rude.

12

statement was not being offered for the truth of what the victim said, but for the effect, if any, that the victim's statement had on the innkeeper. The innkeeper added that the victim had also told her that if Diamond and her boyfriend show up, the innkeeper should not tell them that the victim was at the motel—that she was out at the store. As a consequence, when Diamond came to the motel, alone, the innkeeper told her that the victim was not there nor in her suite and she was not answering her phone. The innkeeper testified that after she told Diamond this, the latter remained in the lobby for a couple of minutes, then left.

Defendants here contend that admission of the victim's statement that Diamond's boyfriend was a mean guy violated their confrontation rights and, therefore, rendered anything the innkeeper testified to unusable by the jury to corroborate the cousin's version of the crimes.[15] However, the failure of either defendant to object on this basis forecloses their current claim. (*Lopez, supra,* 56 Cal.4th at pp. 1028, 1065.) Moreover, the statement was admitted only to explain why the innkeeper lied to Diamond and told her that the victim was not on the premises, not for its truth. Thus, it is not testimonial. (*Maciel*, *supra*, 57 Cal. 4th at p. 533.) However, defendants here contend that during her

---

**15** Defendants then appear to abandon their confrontation argument by saying, "Irrespective of whether the above violated the Sixth and Fourteenth Amendments, the above testimony was pure hearsay, and should have been fully blocked before the jury with a proper objection that it was hearsay." However, as we have already stated, Shyne's trial counsel *did* object on the basis of hearsay and the trial court overruled it. We refer the defendants to our discussion in the text as to why the statement did not constitute hearsay.

argument to the jury, the prosecutor invited the jury to use the statement as though the matter asserted therein was true.**16** We disagree. What the prosecutor argued was that Shyne used Diamond to check on the victim, thereby she "d[id] his dirty work for him." Thus, the truth of the victim's assertion, i.e., that Diamond's boyfriend was mean, to the extent the jury reasonably inferred that Shyne was said boyfriend, was completely irrelevant to the use to which the prosecutor was inviting the jury to make of the evidence concerning the incident.**17**

    c. *One of the Prosecution's Gang Experts*

        1. *Certain opinions*

A prostitute, who testified that she worked for Shyne, said that he was a member of the Grape Street gang in Los Angeles. As already stated, the victim's friend testified that when Shyne threatened the victim in 2007 or 2008, he said that he had people from Pomona who had the ability to reach out and touch the victim, and when he was ready, he would "get" the victim without lifting a hand. Both prosecution gang experts testified that 87th Street had members who lived in, inter alia, Pomona. Shyne's cousin testified that he and McClane were members of 87th Street, of southeast Los Angeles, then

---

**16** We also note that neither defendant objected to the prosecutor's argument in this regard.

**17** We recognize that the arguments of appellate counsel for Shyne are largely a duplication of his new trial motion below, but a cursory proof-reading of his opening brief would have resulted in the elimination of his referring to his opening brief as a motion.

14

Pomona, he had told a Pomona Police Department Detective that he was a member and a search of his home corroborated that. He had an 87th Street tattoo on his back. Items found in McClanes's and the cousin's homes were consistent with their membership in 87th Street. A Los Angeles Police Department officer, who was an expert on the 87th Street Crips, opined that McClane was a member of that gang, an opinion concurred in by the Pomona Police Department detective, who was also an expert on 87th Street. McClane's body and his face bore numerous 87th Street tattoos. Nine days before the crimes, McClane admitted to police being an 87th Street member "for life."

Shyne's cousin testified that to stay in 87th Street, he had to commit crimes for it, which occurs in all gangs. The L.A.P.D. officer testified that a gang member gets to be a leader by "putting in work," meaning committing, inter alia, violent crimes. He said that non-gang members hire gang members to commit crimes for them and they use relatives who are gang members to commit crimes for them because they trust them not to snitch on them. He said that it was possible that Grape Street allied itself with 87th Street to facilitate the commission of big crimes, like robberies, and a member of Grape Street could use a relative, whom they trust and who is a member of 87th Street, to help commit a murder because the latter would not run scared or rat them out to police. The officer recalled the preliminary hearing testimony of the Pomona Police Department Detective, during which the latter opined that McClane and Shyne's cousin were self-admitted members. The officer testified to the following, without objection: that he was aware of gang members using members of other gangs to commit crimes because this enables the

15

former to broaden their criminal enterprise and leaves the heat for the crime to fall on the other gang; that two different Crip gangs associating with each other to commit a robbery would benefit both gangs because both would gain financially from the crime and the word would get out on the street that both gangs united to commit the crime,[18] and that a non-gang member using Crip gang members to commit a crime would benefit the gang members because it would increase their status due to committing crimes and it would strengthen the non-gang member's ties to the gang so that he can feel free to call on them for future crimes.[19,20]  The prosecutor then elicited from the officer that he had been present during the preliminary hearing in this case and he had listened to the testimony presented during it, he briefly reviewed the police reports and he had spoken to the officers involved in them.  *He then testified, without objection, that, in Shyne's opinion,*

---

[18]  For the sake of completeness, McClane's trial counsel unsuccessfully objected to the question, "Would two different Crip gangs associating with one another to commit a robbery benefit both the Crip sets?" on the basis that it was an incomplete hypothetical and it called for speculation.  Earlier, McClane's trial counsel had made an unsuccessful irrelevancy objection to the question whether gang members like videos of themselves appearing on the news or information about them appearing in newspapers.  We mention this only because McClane calls our attention to it as one of the objections he made at trial to this officer's testimony.

[19]  For the sake of completeness, McClane's trial counsel unsuccessfully objected on the basis that the question had already been asked and answered.

[20]  The witness had previously testified, without objection, that he had heard of non-gang members using gang members to commit crimes and non-gang members using relatives who are gang members to commit crimes.  The prosecutor's question as to why the latter occurred was unsuccessfully objected to by trial counsel for Shyne on the basis that it called for hearsay.

16

*the cousin and McClane robbing a prostitute would benefit 87th Street because word would get out on the street that they were committing a crime and this would also enhance their status in the gang, besides being financially rewarding. He also testified, without objection, that having a clip of the surveillance footage of McClane and Shyne's cousin at the motel would enhance 87th Street's reputation in the community and instill fear of McClane and the cousin in the community. He further testified, without objection, that Shyne, "the pimp in this case," associating with two 87th Street members would benefit Shyne because it demonstrated to even rival gang members that Shyne has close ties with 87th Street and would discourage others from "messing with" Shyne due to those ties. He also testified, without objection, that Shyne associating with 87th Street members would "distance the pimp, . . . Shyne, away from the actual crime because . . . [¶] . . . [¶] [i]f they get caught, then he can walk."*[21] *Finally, he testified, without objection, that if Shyne "has any other prostitutes now," and they find out that another prostitute was killed by two 87th Street members at Shyne's direction, they would be cooperative with Shyne in the future.* Later, when the Pomona Police Department Detective testified, he said, without objection, that when the surveillance footage of McClane and Shyne's cousin at the motel was shown in the media, it enhanced the reputation of 87th Street in Pomona in that it increased respect for the gang by

---

[21] When the prosecutor "helped" the witness with the portion of his answer that dealt with Shyne not getting caught because he had used 87th Street members to do the crime for him, McClane's trial counsel unsuccessfully objected on the basis that the witness's answer went beyond the scope of the question and was non-responsive.

demonstrating that their members "put in work" for the gang, they are not just talk and they will take care of business, including killing, thereby increasing respect for the gang by other gangs or spin-offs in the area, increasing intimidation by 87th Street of the citizenry, and, within the gang, McClane and the cousin would move up the ranks.  It is admission of the italicized testimony that McClane now claims requires reversal of his convictions and the allegation true findings because, he asserts, it usurped the function of the jury and violated his Fifth, Sixth and Fourteenth Amendment rights, including his right to a fair trial and due process.

Because McClane did not object below to this testimony on these bases, he waived his current complaint about it.  (*People v. Kelly* (2007) 42 Cal.4th 763, 793.)  As a fall-back position, he claims his trial counsel was incompetent for failing to so object to it.  In order to prevail in this regard, he must demonstrate, inter alia, that had counsel objected on these bases, there is a reasonable probability McClane would have enjoyed a more favorable outcome.  (*Strickland v. Washington* (1984) 466 U.S. 668, 687, 688.)

McClane relies on *People v. Vang* (2011) 52 Cal.4th 1038 in asserting that the evidence was inadmissible.  However, *Vang*, itself, made clear that the issue before it was not the propriety of expert testimony regarding specific defendants, but, rather the propriety of hypothetical questions which closely track the facts in the case.  (*Id*. at p. 1048, fn. 4.)  In fact, *Vang* stated, "It appears that in some circumstances, expert testimony regarding the specific defendants might be proper.  (*People v. Valdez* (1997) 58 Cal.App.4th 494, 507 [(*Valdez*)] . . . cited with approval in *People v. Prince* (2007) 40

18

Cal.4th 1179, 1227 . . . .)" (*Ibid.*) The *Vang* court "assume[d] for present purposes the expert could not properly have testified about the defendants themselves." (*Ibid.*)

In *Valdez*, a caravan of vehicles drove by three homes and a resident of one of them yelled, "Sureno" at the caravan. (*Valdez*, *supra*, 58 Cal.App.4th at p. 499.) The caravan returned to the area and several members got out and yelled, "Norteno." (*Ibid.*) One caravan member with a knife broke a window on one of the houses and slashed the tires of a car. (*Ibid.*) The caravan then drove off. (*Ibid.*) The caravan drove to an elementary school where one of the cars pulled up next to the victim's car. (*Ibid.*) Caravan members got out of their cars, some yelling "Norte," "fourteen" and gang names. (*Ibid.*) Some ran to where people were standing near the school. (*Ibid.*) The defendant got out of one of the cars with a gun and raised it to eye level. (*Ibid.*) Others began to run. (*Ibid.*) The defendant asked the victim what was up. (*Ibid.*) The victim said he did not even know the defendant and he began rolling up his car window. (*Ibid.*) The defendant, with a look of rage on his face, shot the victim in the head. (*Ibid.*) Members of the caravan returned to their cars and took off. (*Ibid.*) Members of the caravan later said they had been out looking for Surenos to fight, having had previous unpleasant contact with them. (*Id*. at p. 500.) Defendant shared their dislike of Surenos, admitted that he had been angry the day of the shooting, and believed that the victim was a Sureno. (*Id*. at p. 501.) An expert testified that gangs in the area were divided into Nortenos and Surenos, who often clashed with each other, but Norteno gangs tended to unite against Sureno gangs. (*Id*. at p. 502.) He opined that members of the caravan,

19

including defendant, were from several Norteno gangs. (*Id*. at p. 503.) He opined that at the time of the shooting, the caravan, including defendant, acted for the benefit of, in association with, or at the direction of all of those gangs. (*Id*. at pp. 503, 504.) The appellate court noted that whether defendant acted for the benefit of a gang was "an ultimate factual issue for the jury to decide." (*Id*. at p. 507.) It continued, "'There is no hard and fast rule that the expert cannot be asked a question that coincides with the ultimate issue in the case.' [Citations.] "'[T]he true rule is that admissibility depends on the nature of the issue and the circumstances of the case, there being a large element of judicial discretion involved.""" (*Id*. at p. 507.) The *Valdez* court noted that in *People v. Garderly* (1996) 14 Cal.4th 605, "the trial court properly allowed expert opinion concerning whether a particular incident was 'gang-related activity' . . . ." (*Valdez*, *supra*, 58 Cal.App.4th at p. 508.) The appellate court concluded, " . . . [H]ad all or most of the participants in the caravan been affiliated with the same Norteno gang, then perhaps expert testimony about rivalries, turf, respect, and forms of violence used by gangs might enable a jury to determine the 'for the benefit etc.' element as easily and intelligently as a gang expert could, thereby precluding the need for an expert opinion on that specific issue. However, . . . [t]he participants in the caravan were a diverse group, with affiliations to different gangs. They united for one day to attack Surenos. At the time it assembled, the caravan was not a 'criminal street gang' . . . [¶] Under the circumstances, the questions of how such a diverse group, which, in [the] opinion [of the expert], represented seven different Norteno gangs, could have been acting for the benefit

20

of a street gang and whether the participants were doing so presented matters far beyond the common experience of the jury and justified expert testimony. . . . [W]e find [the expert's] opinion here more like those permitted in . . . *Garderly* . . . . [W]e cannot say the trial court abused its discretion in finding that an expert opinion about whether the participants acted for the benefit of each and every gang represented by the caravan would be of assistance to the jury in evaluating the evidence and determining whether the prosecution had proved the enhancement allegation. Such an opinion was not tantamount to an opinion . . . that the enhancement allegation was true, for there were other elements to the allegation that had to be proved." (*Id*. at pp. 508-509.)

While in *People v. Gonzalez* (2006) 38 Cal.4th 932, the California Supreme Court acknowledged that *People v. Killebrew* (2002) 103 Cal.App.4th 644 prohibited an expert from testifying to his or her opinion of the knowledge or intent of the defendant, our high court "assume[d], without deciding, that *Killebrew* is correct in this respect . . . ." (*Id*. at p. 946.)

More importantly, given the testimony that was admitted, with which McClane does not here take issue, he cannot carry his burden of showing a reasonable probability that had the expert not answered the four questions at issue, there is a reasonable probability McClane would have enjoyed a better outcome. As already stated, the L.A.P.D. officer testified, and McClane does not here challenge the admissibility of this evidence, that Grape Street, of whom Shyne was a suspected member, could ally itself with 87th Street to commit a robbery and a member of Grape Street could use a relative,

21

whom the member trusted, to help commit a murder, that gang members use members of other gangs to commit crimes for them and why, how two different Crip gangs associating with each other to commit a robbery would benefit both gangs and why and how a non-gang member using Crip gang members to commit a crime would benefit both. Further unchallenged evidence on this topic was the testimony of the officer that the media showing the surveillance footage of McClane and Shyne's cousin at the motel benefitted 87th Street and benefitted the cousin and McClane within the gang.

### 2. *All of his Testimony*

Although Shyne's argument is difficult to discern, it appears that he and McClane are taking issue with the admission of all of the L.A.P.D. officer's testimony on the basis that Shyne's cousin opined that what occurred on December 19th, 2008 was not "a gang thing" and had nothing to do with a gang at all.

Without citing to any portion of the record, defendants assert that the prosecutor had been told pretrial by the cousin that it was the latter's opinion that the crimes were not related to a gang, yet, the prosecutor failed to elicit this opinion from the cousin during the latter's direct testimony.[22] Our review of the record reveals no basis for this

---

[22] Shyne also asserts that the People had an obligation "to correct false testimony, even if they did not know about it prior to it being presented." Shyne cannot have it both ways—either the cousin's testimony that the crimes were not connected to the gang was "false" or it was "true." If true, Shyne's argument that the People should not have presented the testimony of the L.A.P.D. officer because, in the cousin's opinion, the crimes were not gang-related, should be addressed by this court. If false, it should not, as Shyne's basis for arguing that admission of the officer's testimony was improper disappears.

premise, therefore there is no need to address the defendants' argument based on it. Moreover, even if the prosecutor was aware that Shyne's cousin would claim at trial that he was of the opinion that the crimes were not gang-related, defendants cite no authority holding that the prosecutor was obligated to call this fact to the jury's attention. In fact, the cousin's opinion whether these crimes were gang-related, much like the cousin's opinion that if he did not shoot the gun, he would not be charged with the murder of the victim, was irrelevant.

Defendants assert that the People knew this was not a gang case and, yet, they suppressed what they term was the "truth." As a the basis for this claim, they assert "the record is replete with . . . recorded conversations/interrogations of [Shyne's cousin]." However, defendants fail to point to any portion of any conversation with or interrogation of the cousin by the police during which the latter states his belief that these crimes were not gang-related. Additionally, the cousin ultimately pled guilty to voluntary manslaughter, robbery and burglary, and *he admitted gang allegations*. So much for his belief that the crimes were not gang related. Even if he held such a belief, this would have created no obligation on the part of the prosecutor because whether these crimes were gang related or not was an issue of fact to be determined by the jury, not by the cousin, and as long as the People proceeded in good faith to charge defendants with the gang enhancement allegations and presented evidence to support them, nothing improper occurred.

23

Next, defendants appear to argue that the L.A.P.D. officer admitted that he had limited knowledge of how the gangs of which he had experience interfaced with prostitution. They misconstrue the officer's testimony. He said that in the division where he works in Los Angeles, there are only one or two streets where prostitutes walk them for business, therefore, it is the gangs that are near those streets that engage in prostitution. He went on to testify how gang members pimping creates a low risk source of income because the pimps tend to stay away from the prostitutes except to periodically collect whatever money the latter has taken in and, thus, they avoid detection and capture by the police. Accordingly, the officer demonstrated a certain degree of knowledge about how gangs interface with prostitution.

Defendants fail to persuade us that the prosecution should not have introduced the testimony of the L.A.P.D. officer because there was insufficient evidence that the crimes were gang related, as described further in this opinion.

2. *Jury Instructions*

a. *Shyne's Friend as Accomplice*

As is pertinent to this issue, Shyne's friend testified that he and Shyne had been good friends for 12 years. In 2008, both sold drugs and pimped. Shyne's friend met the victim at the truck stop in Ontario and both he and Shyne sold drugs to her. Additionally, Shyne was, at some point, the victim's pimp. Shyne's friend knew that the victim had money because she bought drugs from him. Around Christmastime, 2008, Shyne's finances were bad, he needed money and his friend loaned him some. The friend

24

testified, "we both knew or he knew that [the victim] had money at the time . . . ." The victim told Shyne's friend that she was using Craigslist to attract customers and at the time, the friend thought this was a good way to make a lot of quick money. Everyone at the truck stop, including Shyne, knew that the victim would go to Vegas and make money there prostituting herself, as she would return each time with a new car. Testifying about the three times Shyne's friend loaned money to Shyne, he added that there were times when Shyne would loan him money,[23] but he did not specify when that occurred. When asked what occasioned Shyne's friend loaning Shyne money around Christmas, 2008—whether the friend just woke up one morning and decided to give Shyne some money—the friend testified, "At the time we both was [*sic*] going through somewhat the same thing. We're both single fathers, . . . and at that time, . . . he was struggling . . . with the kids and . . . [his] baby mother, . . . same as myself. So, therefore, . . . I know that at the time that he needed money . . . . [H]e might discuss it every now and then, hint around it, but I knew that he needed it."

The defendants assert that the foregoing constituted evidence that *Shyne's friend* lacked the money he needed to give gifts at Christmas, and "[a]round Christmas,

---

[23] Specifically, he testified, "I actually loaned [Shyne] money at the time [(Christmas, 2008)], also, vice versa . . . ." When asked if he "actually loaned Shyne any money . . . [¶] . . . [¶] . . . around Christmastime of 2008[,]" he testified, "Yes, vice versa." Finally, when asked how much money the friend gave Shyne around Christmas, 2008, the friend testified, "I cannot exactly tell you the exact dollar amount, but I did. And it was often vice versa . . . ."

25

2008, . . . [Shyne's friend] and Shyne alternated in loaning money to each other."[24]

Shyne's friend's testimony does not support either assertion. Without citing to any portion of the record, defendants then make the following assertion, "Indeed, it well appeared that [Shyne's friend], a fellow 'pimp' of [Shynes], had been instrumental in putting . . . Shyne in touch with [the victim] in the start of their relationship." Not that it really matters to defendants' ultimate assertion, but there is nothing in Shyne's friend's testimony to support this. From their mischaracterization of Shyne's friend's testimony and their unsupported assertion that it was the friend who introduced the victim to Shyne, the defendants go on to contend, "Clearly, the duo of [Shyne's friend] and [Shyne] looked to [the victim] as the solution to their 2008 pre-holiday problems and the

---

**24** While not relevant to our discussion, there are a number of other mischaracterizations of the evidence in the discussion by appellate counsel for Shyne of this issue. He asserts that Shyne's friend "believed [that] Diamond was Shyne's' 'bottom bitch,' i.e., his main prostitute." In fact, the testimony was as follows:

"Q    [COUNSEL]: [W]as Diamond [Shyne's] bottom bitch? [¶] . . . [¶]
"A    [SHYNE]: [H]e had other girls, so I don't know. [¶] . . . [¶] . . . I know he had . . . [¶] . . . [¶] . . . maybe two, maybe three.
"Q    [COUNSEL]: . . . Do you know which one of those girls was . . . Shyne['s] . . . bottom bitch?
"A    [SHYNE]: No I didn't."

Referencing December, 2008, appellate counsel for Shyne states, "[The victim] loaned [Shyne's friend] money, but he did not know if [the victim] loaned Shyne money . . . ." The testimony was as follows:

"Q    [COUNSEL]: Did [the victim] *ever* lend you money?
"A    [SHYNE]: Yes.
"Q    [COUNSEL]: Did she ever lend . . . Shyne money?
"A    [SHYNE]: That's between him and [her].
"Q    [COUNSEL]: Did you ever see her give him money?
"A    [SHYNE]: Yes."

26

discussion led to a plan to rob [the victim]; . . . the plans of [Shyne's friend] and [Shyne] . . . [were] clearly, quite the selfish goal . . . , i.e., the solution to [Shyne's friend's] and [Shyne's] own . . . problems." However, there was NO evidence that Shyne's friend needed money around Christmas, 2008 (if he did, how was he able to give Shyne money?) and there was absolutely NO evidence, or any inference that could reasonably drawn from any evidence, of any agreement between Shyne and his friend to rob the victim. Given this total lack of evidentiary support, we necessarily reject defendants' assertion that the trial court had a sua sponte duty to instruct the jury that it was to determine whether Shyne's friend was an accomplice to a robbery of the victim, and if the jury so concluded, that it could not use Shyne's friend's testimony to corroborate the testimony of Shyne's cousin.[25]

b. *On Corroboration*

Defendants assert that the trial court erred by failing to "sua sponte, provide an instruction, . . . [for] the jury to determine what, if anything, constituted corroboration . . . " However, the jury was instructed that it could not convict either

_____

[25] Appellate counsel for Shyne caps off his contention by asserting, "Indeed, . . . [Shyne's friend] admit[ted] to selling drugs to [the victim] and confesse[d the] crime before the jury, raising the issue whether the People gave [Shyne's friend] a non-disclosed 'deal' to testify in this case." If by the crime the friend confessed, appellate counsel for Shyne means the fact that Shyne's friend was a pimp, as well as a drug dealer, it was for *trial counsel* for Shyne to question Shyne's friend as to whether a deal had been made between him and the prosecutor for his testimony, *which trial counsel did not do*. It is *not* for appellate counsel, at this juncture, to suggest that there might have been such a deal, based on no evidence whatsoever.

defendant based on the statements or testimony of the cousin unless that statement or testimony was supported by other evidence the jury believed, that evidence was independent of the cousin's statements or testimony and the evidence tended to connect each defendant to the commission of the crimes. The jury was also instructed that the supporting evidence may be slight, that it did not need to be enough in itself to prove that the defendant is guilty of the charged crime and it did not need to support every fact mentioned by the cousin in his statements or testimony. However, it was not enough that the supporting evidence showed only that a crime was committed or the circumstances of its commission—it had to tend to connect the defendant to the commission of the crime. Defendants do not state how this instruction fell short of what the law requires—in fact, it does. (*People v. Valdez* (2012) 55 Cal.4th 82, 147, 148.) To the extent they are suggesting that the jury should have been instructed that it was required to specify in its verdict which evidence it believed corroborated the cousin's account of the crime, they cite no authority for this proposition.

c. *On Reasonable Doubt*

Interwoven in his argument that there was insufficient evidence to support the gang enhancement findings, Shyne, on behalf of both defendants, appears to assert that, somehow, the jury instruction on reasonable doubt was defective. He fails to state in what way the standard instruction on reasonable doubt and/or the instruction that the enhancement allegations must be proved beyond a reasonable doubt were defective, and

28

as such, there is nothing for us to address.  (See *People v. Ashmus* (1991) 54 Cal.3d 932, 985 fn. 15.)

### d. *On Misdemeanor Assault*

Based on the faulty premise that there was insufficient corroboration of Shyne's cousin's account that he and McClane entered the victim's motel suite in order to rob her and there was evidence from which the jury could reasonably infer that McClane and the cousin entered the victim's motel suite only to commit misdemeanor assault or battery on her, McClane here asserts that the trial court had a sua sponte duty to instruct on this alternate theory as to why they entered her suite and the failure to do so requires reversal of his convictions.  McClane refers to this alternate theory as a "defense" to the charged felony murder, but cites no authority so holding.  Moreover, even if this theory can be viewed as a "defense," we disagree with McClane's assertion that there was substantial evidence (*People v. Barton* (1995) 12 Cal.4th 186, 195) that McClane and Shyne's cousin entered the victim's suite merely to commit misdemeanor assault or battery.  The fact, alone, that McClane went, "equipped with a gun," belies this.

McClane first asserts that the "sole [non-accomplice] evidence demonstrating the contemplation of a robbery was the *uncertain* testimony that the contents of a woman's purse was strewn on the couch near [the victim's] body."  What McClane means by categorizing the evidence that what appeared to be the contents of a purse were found on the couch next to the victim's body as "uncertain" is beyond us.  In fact, the male officer who first entered the victim's suite testified that he saw items on the couch which a

29

female officer said, and the male officer agreed, appeared to be the contents of a woman's purse, including papers, several lighters, a tampon and chewing gum. The female officer testified that there were "numerous personal effects" on the couch, including a tampon, lighters, makeup items, lotions and, perhaps, a pen. The jury was shown photographs of these items. This evidence corroborated Shyne's cousin's account, despite conflicts in his statements, that he saw McClane dump out the contents of the victim's purse. McClane's current assertion that a purse was not found at the scene belies the record—the case agent testified that a purse was found in the suite. The fact that what Shyne's cousin said Shyne wanted from the robbery, i.e., the victim's laptop, was not taken, did not, as McClane asserts, undermine the cousin's account of the crimes. According to the cousin's description of events, McClane did not have time to locate and take the laptop before he shot the victim and McClane and the cousin fled the suite. Moreover, according to the first officer to arrive at the motel, the laptop was set up on the kitchen counter in front of a chair and the photographic evidence corroborates this. Based on a photo of the area, which was shown to the jury, it is conceivable that the laptop was not immediately visible to anyone entering the suite because of the positioning of the chair. McClane's assertion that the only disturbance indicative of a robbery or theft were two overturned vases near the entry is also incorrect. The female officer testified that aside from the contents of the purse being on the couch, the rug and the furniture near the victim was also disturbed. A photo shown to the jury confirmed this. Although McClane acknowledges that a laptop computer was found in the victim's

30

suite which contained a list of names and phone numbers of, inferably, the victim's, customers, and correspondence between the victim and those answering her erotic Internet ads, he fails to concede that this evidence corroborated Shyne's cousin's account that Shyne instructed his cousin and McClane to take the laptop for Shyne. The same is true of evidence of a cell phone connected to McClane making and receiving calls with Shyne's cell phone,[26] the cousin's and the victim's the night of the crimes up to the time of their commission. The evidence, which McClane points out, that Shyne was having financial problems around the time of the crimes and was aware that the victim was making a lot of money because of her Craigslist ads, supported, rather than detracted from, the prosecution's theory that Shyne sent his cousin and McClane into the victim's motel suite to steal her laptop. For McClane to assert, as he does, that the cousin had no motive to rob the victim ignores the fact that the cousin had just gotten out of prison.

McClane then asserts that based on testimony about Shyne's interactions with some of his other prostitutes, "the evidence in this case amply allowed an inference that [McClane] and [Shyne's cousin] went to [the victim's m]otel [suite] only with the intent to threaten, hit, and scare [the victim] . . . ." Shyne's cousin told police and testified that Shyne had instructed him and McClane to "rough up" the victim a bit and she would give them what they wanted or give them money. The jury could reasonably infer that McClane did precisely this, *with the objective of taking the victim's property*. However,

---

[26] The cousin testified that he was always with McClane, and Shyne had seen them together "a lot."

31

there was no evidence that McClane and Shyne's cousin went to the victim's suite merely to commit misdemeanor assault or battery on her, without depriving her of her property—no more than there was evidence that they went there to rape her based on the fact that she was a prostitute. Moreover, the evidence of Shyne's interactions with some of his other prostitutes did not permit the inference that he used other people, such as McClane and his cousin, to keep the former in line. Finally, this evidence did not go as far as shooting the prostitutes.

Sua sponte instructions on defenses are improper where they are inconsistent with the defendant's theory. (*People v. Sedeno* (1974) 10 Cal.3d 703, 715, disproved on other grounds in *People v. Blakeley* (2000) 23 Cal.4th 82, 89; *People v. Breverman* (1998) 19 Cal.4th 142, 165; *People v. Flannel* (1979) 25 Cal.3d 668, 684, fn. 12.) McClane argued that it was the cousin, and not him, who dumped the victim's purse out on the couch and it may have been the case that McClane stayed out in the hall while the cousin went into the victim's suite and shot her. This is inconsistent with instructions that McClane entered the room to commit misdemeanor assault or battery.

3. *Absence of Verdict Form re Corroboration*

Citing no authority whatsoever, defendants claim that the convictions must be reversed because the jury was not provided a verdict form requiring them to list what facts it found to be corroborative of the cousin's account of the crimes.

4. *Insufficiency of the Evidence*

    a. *Corroboration of Shyne's Cousin's Account*

Shyne claims that the evidence was insufficient to corroborate his cousin's account of his involvement in the crimes. We view the evidence in the light most favorable to the verdict. (*People v. Vu* (2006) 143 Cal.App.4th 1009, 1013.) We will not disturb the trial court's finding that the corroboration was sufficient unless the corroborating evidence could not reasonably tend to connect the defendant with the commission of the crime. (*People v. Falconer* (1988) 201 Cal.App.3d 1540, 1543.)

We have already concluded that the testimony of the victim's friend about the incident involving the victim and Shyne at the motel in 2007 or 2008 could serve as corroboration of Shyne's cousin's account. That incident showed that Shyne considered the victim "his bitch," he had physically attacked her, he was willing to use a gun when someone else came to her aid, he was angry at the victim, he had threatened her life, he said that other people had the ability to hurt and/or kill her on his behalf and she was afraid of him. In addition, the victim's friend testified that the victim was afraid of Shyne and she agreed with her friend that she should keep all the money she made prostituting herself, which, of course, would put Shyne out of the pimping business to the extent he depended on the money she brought in. This testimony suggested that Shyne had a motive for setting up the robbery of the victim and that he participated in the robbery-turned-murder just as his cousin asserted he had. This was corroboration of the cousin's version of Shyne's involvement in the crimes.

33

The testimony of the innkeeper, which we have already concluded was properly before the jury, showed that around the time of the crimes, the victim was avoiding Diamond and her boyfriend. If the jury reasonably inferred that Diamond's boyfriend was Shyne, this was evidence that the relationship between Shyne and the victim had broken down around the time of the crimes. This constituted corroboration of Shyne's cousin's account of the crimes that included Shyne as the instigator of the operation and the driver of the get-away car.

The testimony of Shyne's friend that around the time of the crimes, Shyne was hard up for money, and the victim was doing well financially, which we have already determined was available to the jury to use as corroboration, provided the motive for Shyne to orchestrate and participate in the planned robbery of the victim, which turned into a murder. Shyne's friend also testified that he believed that Shyne and the victim had had a falling out. This was corroboration of Shyne's cousin's version of Shyne's participation in the crimes.

The testimony of the two prostitutes who worked for Shyne and their statements to law enforcement showed, inter alia, that Shyne controlled them through fear and would retaliate against them when they did not do what he wanted them to do or tried to leave him and that Shyne had been violent with them and had threatened them and their families. Their testimony and statements to the police also showed that Shyne used others as enforcers, specifically, Diamond, in controlling his other prostitutes. This

34

constituted corroboration of Shyne's cousin's account of Shyne's involvement in these crimes.

Corroboration was also supplied by the presence in the victim's suite of a laptop computer containing information related to the victim's occupation as a prostitute, a list of what could reasonably be inferred were her customers, and phone records for phones connected to Shyne and the victim. The phone records showed multiple calls from Shyne to the victim interspersed with calls between Shyne and McClane the day of the crimes, up to 10:11 p.m., and that Shyne was in close proximity to the motel when the crimes occurred around the time of their commission.

Aside from the gang evidence, which we summarize both above and below, the foregoing constituted more than sufficient corroboration of Shyne's cousin's version of Shyne's participation in the crimes.

b. *Gang Enhancements*

The defendants assert that the evidence was insufficient to support the jury's finding that all three crimes were committed for the benefit of, at the direction of, or in association with a criminal street gang. We disagree.

Besides the evidence, already mentioned above, that Shyne, his cousin and McClane were gang members, and the testimony of the L.A.P.D. officer, as described above, an Ontario Police Department Detective testified as an expert concerning pimping and prostitution. He said that he had encountered a lot of pimps that were former gang members. Shyne's cousin testified that gang members have to do crimes for the gang in

35

order to stay in it. He also said that when a gang member commits a crime and there's another gang member present to witness it, this enhances the former's status in the gang. He further said that McClane would get more status in the gang for committing murder, which is the most rewarding crime you can commit for purposes of your position in the gang.

A Pomona Police Department Detective testified as an expert that different Crip sets have worked together in Pomona to commit crimes. He also said that it was possible that family members from different gangs would cooperate with each other in committing crimes. He testified that the African-American gangs in Pomona engaged in pimping. Like the L.A.P.D. officer, he opined that when the video of McClane and Shyne's cousin at the motel was shown in the media, it increased respect for 87th Street and for McClane and the cousin within the gang and with rival gangs. He added that if civilians thought that 87th Street members had committed a homicide, the former would not cooperate with the police, to 87th Street's advantage.

The prosecutor argued to the jury that Shyne asked his cousin to get McClane to help the cousin commit the crimes because the primary activities of 87th Street were robbery, murder and the use of firearms. As to whether the facts showed that the crimes were committed for the benefit or, at the direction of or in association with a gang, the prosecutor said, "This case is all about association. I don't have to prove these two [(meaning, "for the benefit of or at the direction of")]. That's why the 'or' is there." She argued that this case was one of association because Shyne picked two 87th Street

36

members to commit the crimes, adding, again, that she did not have to prove that the crimes were at the direction of the gang or benefitted the gang. As to the element of the gang allegations that the defendant had to intend to assist, further, or promote criminal conduct by gang members, the prosecutor argued that it was not necessary that the crimes be gang related, i.e., that they were committed to prove that the perpetrator is a gang member, or that money is stolen to be funneled into the gang for its use or that the victim was murdered because he or she was a rival gang member. The prosecutor said that the crimes just had to be in association with gang members, i.e., that gang members are being used to commit them and they were so used because they are gang members. During final argument, the prosecutor repeated her earlier argument, thusly, "We're not talking about benefit for a criminal street gang. . . . [W]e haven't been talking about . . . [for the benefit of a gang.] This is an association. . . . Shyne just has to associate with two other gang members . . . and commit any . . . crime. It doesn't even have to be gang related. And that's what we're talking about. . . . [G]ang members don't understand [the allegations]. [¶] . . . [¶] Just like [Shyne's cousin] didn't know what felony murder was, he didn't know what that was."

To the extent that defendants argue that the failure of McClane and Shynes's cousin to announce that they were from 87th Street at the time they committed the crimes (albeit the tattoos on McClane's face were announcement enough), or bragged about them to gang members later, this does not undermine the jury's findings. The L.A.P.D. officer testified that when gang members commit a robbery or shoot someone to get

37

money, they do not announce their gang affiliation because they do not want witnesses to be able to identify them.  Moreover, the People made an election to try the gang enhancement solely on the basis that the crimes were committed in association with a gang.  Defendants cite no authority holding that an announcement or bragging after the fact are the sine qua non of this allegation.

In *People v. Morales* (2003) 112 Cal.App.4th 1176, the gang expert testified, in response to a hypothetical question that incorporated "the critical facts" of the case, that the crimes had been committed for the benefit of, at the direction of or in association with a gang because they involved three gang members acting in association with each other.  (*Id*. at p. 1197.)  He went on to say that the gang provided a ready-made manpower pool and one member chose to commit the crimes in association with other members because he could count on their loyalty.  (*Ibid*.)  Additionally, the presence of multiple gang members increased the intimidation factor.  (*Ibid*.)  Such crimes benefitted the perpetrators within the gang and benefitted the gang with notoriety amongst rival gangs and in the community.  (*Ibid*.)  Rejecting the defendant's contention that there was insufficient evidence to support the gang enhancement findings, this court held, "[I]t is conceivable that several gang members could commit a crime together, yet be on a frolic and detour unrelated to the gang.  Here, however, there was no evidence of this.  Thus, the jury could reasonably infer the requisite association from the very fact that defendant committed the charged crimes in association with fellow gang members.  [¶]  If defendant is arguing that there was insufficient evidence of the specific intent element[, i.e., that

defendant intended to assist, further or promote criminal conduct by gang members] . . . , we disagree. Again, specific intent to *benefit* the gang is not required. . . . Here, there was evidence that defendant intended to commit robberies, that he intended to commit them in association with [two fellow gang members] and that he knew that [these fellow gang members] were members of his gang. Moreover, . . . there was sufficient evidence that defendant intended to aid and abet the robberies [his fellow gang members] actually committed. It was fairly inferable that he intended to assist criminal conduct by his fellow gang members." (*Id*. at p. 1198.)

In *People v. Leon* (2008) 161 Cal.App.4th 149, 163, where the People presented evidence that the defendant committed burglary and firearm possession in association with a fellow gang member, the appellate court concluded that there was sufficient evidence that the defendant committed the offenses in association with a gang. Also, evidence that the defendant intended to commit the crimes, that he intended to commit them in association with his fellow gang member and that he knew his fellow gang member was a member of his gang was sufficient to support the jury's implied finding that defendant had the specific intent to promote, further or assist in any criminal conduct by gang members. (*Ibid*.) Division One of this court added, "'[A] specific intent to *benefit* the gang is not required.' [Citation.]" (*Ibid*.)

Similarly, in *People v. Romero* (2006) 140 Cal.App.4th 15, the appellate court upheld the jury's implied finding that the defendant had the requisite intent based on evidence that the defendant "intended to commit a crime, that he intended to help [his

39

fellow gang member] commit a crime, and that he knew [his fellow gang member] was a member of his gang." (*Id*. at p. 20.)

Here, Shyne's cousin testified that the idea for the robbery came from Shyne, it was the latter who set it up and who delivered his cousin and McClane to the motel, picked them up afterward and helped get rid of evidence of the crimes. The jury could reasonably infer that Shyne knew that both his cousin and McClane were members of 87th Street. Therefore, there was sufficient evidence of the gang allegations.

Defendants rely on *People v. Albillar* (2010) 51 Cal.4th 47, to claim that there was insufficient evidence here, but their reliance is misplaced. In *Albillar*, two brothers and their cousin, all members of the same gang, helped each other and/or witnessed each other sexually attack the victim. (*Id*. at p. 52.) A gang expert testified about the advantages to the perpetrators in terms of accomplishing the crime and as to their status in the gang due to committing crimes in the presence of other gang members. (*Id*. at pp. 60, 61.) Based on this, the appellate court found substantial evidence that the defendants "came together *as gang members* to attack [the victim] and, thus, that they committed these crimes in association with the gang." (*Id*. at p. 62.) Similarly, here there was evidence that McClane would benefit within 87th Street and within the community for committing these crimes with Shyne's cousin and that Shyne benefitted by involving gang members in the crimes. *Albillar* also held, "if substantial evidence establishes that the defendant intended to and did commit the charged felony with known members of a gang, the jury may fairly infer that the defendant had the specific intent to promote,

40

further, or assist criminal conduct by those gang members." (*Id.* at p. 68.) Here, there was substantial evidence that both Shyne and McClane intended to and did commit all three offenses and that Shyne knew his cousin and McClane were members of 87th Street, and Mclane knew that his frequent companion, Shyne's cousin, was a fellow member of that gang.

5. *Sentencing*

    a. *Section 654*

At McClane's's sentencing hearing, the trial court ran the term for the burglary concurrent with the term for the murder. The court also said that it intended to run the term for the attempted robbery consecutively to the sentence for the murder because Shyne got his cousin and McClane to carry out his plan and he intended them to take things and "cause some pain" to the victim, but after McClane entered the motel suite, the latter formed the intent to kill the victim, thus McClane had separate intents as to the two offenses. If the trial court's finding of separate intents is supported by substantial evidence, it must be upheld. (*People v. Hutchins* (2001) 90 Cal.App.4th 1308, 1312.) In this regard, we view the evidence in the light most favorable to the People and presume in support of the sentence the existence of every fact the trier could reasonably deduce from the evidence. (*People v. Tarris* (2009) 180 Cal.App.4th 612, 626, 627.)

McClane here contends that sentences for both the burglary and the attempted robbery must be stayed under section 654 for three reasons: (1) he was charged with felony murder, (2) the jury was instructed that he was guilty of murder only under a

felony murder theory for either attempted robbery or burglary and that he was guilty of burglary only if he entered the motel or the victim's suite with the intent to commit an attempted robbery, and (3) the prosecutor argued that McClane was guilty of felony murder because he committed or aided and abetted an attempted robbery or a burglary and he was guilty of burglary because he entered the suite intending to commit or aid and abet the attempted robbery. Additionally, the prosecutor told the jury that it did not have to find that either defendant had the intent to kill. The People here concede that section 654 requires the term for the burglary be stayed, but not for the attempted robbery.

In *People v. Mulqueen* (1970) 9 Cal.App.3d 532, 547, the appellate court held that where a defendant was convicted of first degree felony (robbery) murder and robbery of the murder victim, he could not be sentenced to a concurrent term for the latter because, "it is clear . . . that there was but one act and that the act of robbery was the act which made the homicide first degree murder." Likewise, in *People v. Conrad* (1973) 31 Cal.App.3d 308, 313, 326, 333, the appellate court stayed the sentence for a robbery where the defendant was convicted of felony (robbery) murder for stabbing a store owner to death when she resisted the robbery. In *People v. Holt* (1997) 15 Cal.4th 619 and *People v. Wader* (1993) 5 Cal.4th 610, 670 (*Wader*), the California Supreme Court recognized that the trial court's staying of sentences under section 654 for the underlying felonies was appropriate in light of the sentences imposed for the felony murders. While a reasonable interpretation of the evidence at trial may well be that McClane did not form the intent to kill the victim until after he entered her suite, the jury based its verdict of

42

first degree murder solely on the fact that the victim's death occurred during the commission of the attempted robbery or burglary and not on the fact that McClane *ever* formed the intent to kill the victim. A trial court may not contradict the jury's findings when conducting a section 654 analysis. (*People v. Siko* (1988) 45 Cal.3d 820, 825, 826.) Because use of the felony murder rule by the prosecution frees it from having to prove the usual elements of first degree murder, we cannot agree with the People that utilizing section 654 to stay the sentence for the attempted robbery permits defendant to escape punishment for "gratuitous violence or other criminal acts far beyond those reasonably necessary to accomplish the original offense." (*People v. Nguyen* (1988) 204 Cal.App 3d 181, 191.) Additionally, staying the sentence under section 654 moots McClane's argument that imposing punishment for the attempted robbery also violates his right against double jeopardy. (See *Wader*, *supra*, 5 Cal.4th at p. 670.)[27]

---

[27] Appellate counsel for Shyne, who also represented Shyne at his sentencing hearing, agreed with the prosecutor below that the sentence for the burglary should not be stayed pursuant to section 654 and did not argue that the term for the attempted robbery should be stayed. The prosecutor had made the same section 654 argument as to Shyne that she had made earlier, unsuccessfully, as to McClane. In imposing sentences for both offenses, the trial court impliedly agreed with the "separate intents" argument the prosecution had made as to McClane. Appellate counsel for Shyne did not join in any portion of McClane's appellate briefs, including his two section 654 arguments (although he alludes to them in his reply brief), nor did he, in his reply brief, attempt to apply to his client's sentence the People's concession in their brief that imposing sentence on McClane for the burglary violated section 654. Despite these failings by appellate counsel for Shyne, fairness dictates that we also stay Shyne's sentences for the attempted robbery and the burglary.

b. *One of McClane's Prison Priors*

The parties agree that because McClane served a concurrent prison sentence for two of his prior convictions for which the trial court found he had served two prison terms (§ 667.5, subd. (b)), one of the true findings must be stricken.

## DISPOSITION

As to McClane, the four year concurrent term for the burglary (count 2), the four year, six month term for the attempted robbery in concert (count 3), the five year gang enhancement and the 25 years to life gun discharge causing death enhancement for this offense are stayed pursuant to section 654, leaving a total sentence of two 25 years to life terms, plus two years. The trial court is directed to amend McClane's abstracts of judgment and the minutes of the sentencing hearing to reflect this, as well as to strike any reference to a true finding as to McClane's 2002 prison prior in any minutes. In all other respects, McClane's judgment is affirmed.

As to Shyne, the consecutive sentence of 1 year, four months, for the burglary (count 2) and the consecutive sentence of 6 years for the attempted robbery in concert and the 10 year gang enhancement for this offense are stayed pursuant to section 654, leaving a total sentence of two 25 years to life terms. The trial court is directed to amend Shyne's abstracts of judgment and the minutes of the sentencing hearing to reflect this.

44

The trial court is also directed to impose sentence on the gang enhancement on the murder (count one), which it did not do at sentencing. In all other respects, Shynes's judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ
P. J.

We concur:

McKINSTER
J.

CODRINGTON
J.

45